UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

        Plaintiff,

        vs.

D-1 ZAINAB ALIASGAR HAKIM
(a/k/a "Z")
D-3 PAIGE ELIZABETH FEYOCK
D-4 AHMET KEREM KORKAYA
D-5 JONATHAN HONGRU ZOU
D-8 COLIN HUNTER WEGER
(a/k/a "Beams"),

        Defendants.

CRIMINAL NO. 26-20306

Honorable Judith E. Levy
Honorable Anthony P. Patti

---

## DEFENDANT PAIGE ELIZABETH FEYOCK'S BRIEF IN OPPOSITION TO THE UNITED STATES' BRIEF IN SUPPORT OF DETENTION HEARING SET FOR JUNE 12, 2026

PAIGE ELIZABETH FEYOCK (Ms. Feyock), through her lawyer, CYRIL C. HALL, respectfully submits this Opposition to the Government's Brief in Support of Detention Hearing set for June 12, 2026. The Government seeks to detain Ms. Feyock pending trial, arguing that she poses a serious risk of flight and a danger to the community. Ms. Feyock respectfully disagrees and requests that this Court release her on bail pending trial, subject to reasonable release conditions.

### *Introduction*

The Government's detention motion portrays Ms. Feyock and her co-defendants as extremists engaged in a coordinated campaign of threats and vandalism. But detention must be

based on evidence specific to Ms. Feyock—not rhetoric, political association, or generalized concern about pro-Palestinian activism. Here, the allegations against Ms. Feyock are limited and contested such as protest-related speech, online posts, research activity, alleged private discussions with a co-defendant, purported countersurveillance, one alleged vandalism incident, and alleged witness tampering.

Before addressing the statutory factors, this Court should take note of what the Government has not charged. The indictment contains no terrorism counts, no hate crime counts, no assault counts, and no firearms charges. Yet the Government's brief is saturated with references to Hamas, October 7, "martyrs," "intifada," and the Weather Underground. That rhetorical strategy is not accidental—it is designed to substitute inflammatory framing for the individualized evidentiary showing the Bail Reform Act requires. This Court should reject the invitation to treat Ms. Feyock as a terrorism defendant when she has not been charged with terrorism.

Under the Bail Reform Act, pretrial release is the norm, and detention is permitted only if the Government proves that no condition or combination of conditions will reasonably assure Ms. Feyock's appearance and the safety of the community. The Government has not met that burden. Ms. Feyock is 26 years old, has no criminal history, is employed in the University of Michigan health system, has strong community ties, has served as a doula, and is scheduled to begin medical school at Rush University later this month. The charged conduct is not recent, and the Government does not allege that she personally participated in the most serious acts described in the indictment.

The Government's request is also weakened due to the release of similarly situated, and in some respects more seriously alleged, co-defendants. Applying the statutory factors, appropriate release conditions can reasonably assure Ms. Feyock's appearance and community safety. She should therefore be released pending trial.

*Statement Of Facts Supporting Release*

1. *Strong personal and professional background.* Ms. Feyock is a pre-medical student at the University of Michigan, has served as a doula for laboring mothers, and is currently employed in the University of Michigan health system. Government's Brief, ECF No. 42, Pages 21, 23.

2. *Healthcare service and trustworthiness.* Ms. Feyock's work as a doula and healthcare employee reflects service to vulnerable populations, professional responsibility, and community trust. The Government does not allege that she has ever harmed, threatened, or acted inappropriately toward any patient or person in her care. Id. at Pages 21–23.

3. *No criminal history.* Ms. Feyock has no prior arrests, convictions, pending charges, or criminal history, as reflected in the Pretrial Services report.

4. *Future medical-school enrollment.* Ms. Feyock has been accepted into and is enrolled to begin medical school at Rush University later this month, providing a substantial incentive to appear in court and comply with all release conditions. This will be established through declaration and supporting documentation.

5. *Charges are serious but not violent-terrorism charges.* The indictment charges conspiracy to transmit threats, conspiracy to tamper with a witness, and destruction of property to prevent seizure, but it does not charge terrorism, assault, a hate crime, a violent felony, or any firearms offense. Indictment, ECF No. 1.

6. *Government relies on inflammatory framing.* Although the indictment invokes politically charged references such as Hamas, October 7, red triangles, red handprints, "martyrs," "intifada," and the Weather Underground, those references do not substitute for the individualized showing required under the Bail Reform Act.

7. *Allegations specific to Ms. Feyock are limited.* The Government's allegations against Ms. Feyock consist primarily of private discussions with Korkaya about hypothetical violent acts, alleged countersurveillance, alleged social-media activity, alleged participation in one vandalism incident, alleged witness intimidation, and alleged refusal to open the door during execution of a search warrant. Government's Brief, ECF No. 42, Pages 20–23.

8. *No allegation of participation in most physical acts.* The Government does not allege that Ms. Feyock personally participated in most of the physical acts described in the indictment, including spray-painting buildings, breaking windows at multiple locations, scattering nails in driveways, defacing vehicles, or throwing chemical jars at other locations. Id.

9. *Government attempts to merge protected activity with alleged criminal conduct.* The conspiracy allegations span more than eighteen months and seek to combine protest activity, social-media posts, and teach-ins with later alleged criminal acts into a single conspiracy narrative.

10. *Temporal distance weighs against detention.* The alleged conduct involving Ms. Feyock occurred between September 2024 and April 2025, with the most recent allegation—the search warrant execution—occurring more than a year before the June 2026 detention hearing. Government's Brief, ECF No. 42, Page 22.

11. *No recent alleged criminal conduct.* The Government does not allege that Ms. Feyock engaged in criminal conduct after April 2025, despite its claim that she has been under investigation and surveillance since at least that time. Id.

12. *Older communications do not establish present danger.* The private communications from May 2024 on which the Government relies heavily are more than two years old. Id. at Page 21.

13. *Comparative release of co-defendant undermines detention request.* Co-defendant Ahmet Kerem Korkaya was released on bond with limited conditions despite the Government's assertion that he faced more serious and explicit allegations. Government's Emergency Appeal, ECF No. 17, Pages 171–78.

14. *Korkaya's release supports comparable treatment.* The Government alleged that Korkaya discussed poison, bombs, psychological torture, threats to victims' families, travel to Michigan for vandalism and chemical attacks, alleged terrorist paraphernalia, and planned international travel; nevertheless, the magistrate judge released him and noted that the cited messages were troubling but approximately two years old. Id. at Pages 171–79.

15. *Prior state prosecutions were dropped.* In September 2024, Michigan Attorney General Dana Nessel charged several activists arising from the same University of Michigan campus protest activity at issue here. In May 2025—just weeks after the execution of federal search warrants—Nessel dropped all state charges, stating the case had become "a lightning rod of contention" and that continuing it would no longer serve the public's interest. The Washtenaw County Prosecutor had previously declined to pursue most charges. The federal government's decision to step in and prosecute conduct that state prosecutors declined to pursue, and that the state subsequently dropped after two years, is directly relevant to the question of present dangerousness and the adequacy of release conditions.

16. *Individualized release conditions are adequate.* Given Ms. Feyock's lack of criminal history, healthcare employment, educational commitments, community ties, temporal distance from the alleged conduct, and the release of a more seriously alleged co-defendant,

conditions of release can reasonably assure her appearance and the safety of the community.

*Legal Standard*

Title 18 U.S.C. §3142(e) provides that detention is appropriate only where the court finds that no condition or combination of conditions will reasonably ensure the appearance of the person as required and the safety of any other person or the community. This section is based on the understanding "that in our society, liberty is the norm and detention prior to trial, or without trial, is the carefully limited exception." *United States v. Bell*, 673 F. Supp. 1429, 1430 (E.D. Mich. 1987) (citing *United States v. Salerno*, 107 S.Ct. 2095 (1987). Congress envisioned the pretrial detention of only a fraction of accused individuals awaiting trial. *United States v. Orta*, 760 F.2d 887, 891 (8th Cir. 1985). The structure of the statute mandates that every form of release be considered before detention may be imposed. *Id*. at 892. Detention determinations must be made individually and, in the final analysis, must be based on the evidence which is before the court regarding the particular defendant. *United States v. Tortora*, 922 F.2d 880, 887 (1st Cir. 1990). For a district court considering whether a person is a serious flight risk under 18 U.S.C. § 3142(f)(2)(A), "the standard is reasonably assure appearance, not 'guarantee' appearance, and . . . detention can be ordered on this ground only if 'no condition or combination of conditions will reasonably assure the appearance.'" *United States v. Fortna*, 769 F.2d 243, 250 (5th Cir. 1985); accord *United States v. Orta*, 760 F.2d 887, 889–90 (8th Cir. 1985) (en banc) ("In this case, the district court erred in interpreting the 'reasonably assure' standard set forth in the statute as a requirement that release conditions 'guarantee' community safety and the defendant's appearance.").

*Summary Of Argument*

The Government has failed to meet its burden of proving by clear and convincing evidence that no condition or combination of conditions will reasonably assure Ms. Feyock's appearance and the safety of the community. Under the statutory framework governing pretrial detention, liberty is the norm and detention is the carefully limited exception. *United States v. Salerno*, 481 U.S. 739, 755 (1987).

Application of the four statutory factors under 18 U.S.C. § 3142(g) demonstrates that Ms. Feyock should be released. First, while the charges are serious, they do not include violent felonies or crimes involving firearms, and the Government does not allege Ms. Feyock personally committed the most serious physical acts. Second, the weight of evidence is weakened by the temporal staleness of the alleged conduct, i.e., most recent in April 2025, over one year ago, and the Government's reliance on private communications that may not constitute prosecutable threats under the First Amendment standard established in *Counterman v. Colorado*, 600 U.S. 66, 143 S. Ct. 2106 (2023).

Third, Ms. Feyock's history and characteristics strongly favor release because she has no prior criminal history, maintains employment in a regulated healthcare setting, has served as a doula for vulnerable populations, has developed community ties through education and employment, and has been accepted to medical school-providing powerful incentives to appear for trial. Fourth, the Government's dangerousness argument rests primarily on rhetoric and speculation rather than concrete evidence of actual violence or recent harmful acts.

The comparative treatment of co-defendant Korkaya-who was released on minimal conditions despite more serious allegations-demonstrates that detention is not warranted here. Even assuming the witness tampering allegation has merit, appropriate release conditions can reasonably assure both Ms. Feyock's appearance and the safety of the community. Pretrial

detention is an exceptional remedy and may be ordered only after the Court makes the findings required by federal law based on the record presented.

*Argument and Analysis*

**I.**    **The Bail Reform Act Establishes That Liberty Is the Norm and Detention Is the Exception**

"In our society liberty is the norm, and detention prior to trial or without trial is the carefully limited exception." *United States v. Salerno*, 481 U.S. 739, 755 (1987). The "provisions for pretrial detention in the Bail Reform Act of 1984 fall within that carefully limited exception." *Id*. The Act does not authorize detention prior to trial of all arrestees charged with crimes, but rather only those "with serious felonies who are found after an adversary hearing to pose a threat to the safety of individuals or to the community which no condition of release can dispel." *Id*. Moreover, "'a defendant's threat to the safety of other persons or to the community, standing alone, will not justify pre-trial detention.'" *United States v. Tadlock*, 399 F. Supp. 2d 747, 751 (S.D. Miss. 2005) (quoting *United States v. Byrd*, 969 F.2d 106 (5th Cir. 1992)).

To that end, the Act, under 18 U.S.C. § 3142(a), provides four possible outcomes for an arrestee. The person may be: (1) released on their own recognizance; (2) released on conditions; (3) temporarily detained for purposes not relevant to the current proceedings; or (4) detained until trial if the Court finds that "no condition or combination of conditions will reasonably assure" the defendant's appearance or the safety of others in the community. 18 U.S.C. § 3142(a).

The Bail Reform Act does not authorize a detention hearing for all persons charged with a crime. *United States v. Byrd*, 969 F.2d 106, 109 (5th Cir. 1992) (per curiam) (stating that the Act does not "authorize a detention hearing whenever the government thinks detention would be desirable"); see also *United States v. Ploof*, 851 F.2d 7, 10-11 (1st Cir. 1988) ("[T]he structure of the statute and its legislative history make it clear that Congress did not intend to authorize

preventive detention unless the judicial officer first finds that one of the § 3142(f) conditions for holding a detention hearing exists."); c.f. *United States v. Hardon*, 149 F.3d 1185 (table) (6th Cir. June 4, 1998) (reversing district court order denying revocation of detention order and remanding to set conditions of release because threshold § 3142(f) circumstances not shown).

Instead, the Court is authorized to conduct a detention hearing only if the Government first establishes that one of the circumstances articulated under § 3142(f) exists. See *United States v. Friedman,* 837 F.2d 48, 49 (2d Cir. 1988) ("After a motion for detention has been filed, the district court must undertake a two-step inquiry . . . It must first determine by a preponderance of the evidence . . . that the defendant has either been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice.").

Only if the Government satisfies its burden to show it is entitled to a detention hearing does the Court consider whether there are reasonable conditions that may permit the defendant's release. *Id*. That analysis focuses on whether there are conditions that will "reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 3142(e). In making that determination, the Court considers: "(1) the nature and circumstances of the offense charged[;]" "(2) the weight of the evidence against the person; (3) the history and characteristics of the person[;]" and "(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g)(1)-(4).

Based on the circumstances of this case and the Government's briefing here, the Court fails to satisfy its burden and the Government's brief requesting detention of Ms. Feyock challenges the first step of the Bail Reform Act analysis. Application of these statutory factors demonstrates that Ms. Feyock should be released on bail.

II.     **Nature And Circumstances of The Charged Offense Warrants Ms. Feyock's Release**

The indictment charges conspiracy to transmit threats, conspiracy to tamper with a witness, and destruction of property to prevent seizure. These are not in the category of crimes that Congress identified as presumptively requiring detention. The Government's allegations against Ms. Feyock consist primarily of private discussions with co-defendant Korkaya about hypothetical violent acts, alleged countersurveillance activities, social media posting, research activities, alleged participation in one vandalism incident, and alleged witness tampering. Government's Brief, ECF No. 42, Pages 20-23. Notably, the Government does not allege that Ms. Feyock personally committed the majority of the physical vandalism acts, threw chemical jars at multiple locations, spray-painted multiple buildings, or directly threatened any victims. Id.

Similarly, in this case, because the Government's allegations against Ms. Feyock similarly rely heavily on private discussions, online speech, research, and other ambiguous expressive or preparatory conduct rather than direct threatening communications to a target or conduct unmistakably tied to an imminent violent plan. First, the Government must prove that Ms. Feyock had specific knowledge of and agreement to the criminal objectives of the conspiracy, not merely that she participated in lawful political activity. The Government has not clearly distinguished Ms. Feyock's participation in lawful political protest and activism from her alleged participation in criminal conspiracy.

Second, much of what the Government alleges consists of private discussions and hypothetical statements. Private discussions between friends about hypothetical scenarios, even if crude or offensive, may not meet this standard. Third, the Government's brief does not allege that Ms. Feyock personally participated in the majority of the vandalism, chemical attacks, or other physical criminal acts. Government's case against Ms. Feyock appears to rest on her presence at

planning meetings, her discussions with Korkaya, her alleged countersurveillance activities, her alleged social media posting, alleged participation in one incident, and her alleged witness tampering. None of these allegations, standing alone, establishes that Ms. Feyock committed the physical criminal acts that form the basis of the most serious charges.

Fourth, the comparative treatment of co-defendants is significant. In Korkaya's case, the magistrate judge released him on bond with minimal conditions, despite allegations that his discussed poisoning, bombs, and psychological torture, stated he wanted to work as a doctor for Hamas, traveled from Wisconsin to Michigan to participate in vandalism, and possessed a Hamas flag and beheaded Netanyahu photo upon arrest. Government's Emergency Appeal, ECF No. 17, Pages 171-178. The magistrate judge noted that the violent messages were two years old. Id. at Page 179. If Korkaya-who appears to have more explicit and serious allegations than Ms. Feyock-was released on bail by a magistrate judge, this suggests that the Government's arguments regarding dangerousness and flight risk may be overstated.

### A.  History and Characteristics of Ms. Feyock

Ms. Feyock has no prior criminal convictions or arrests as per the pretrial services report. This is a significant factor favoring release under 18 USCS § 3142. The absence of a criminal history suggests that Ms. Feyock is not a career criminal or habitual offender, and that her alleged conduct in this case may be aberrational rather than reflective of her character. Ms. Feyock has been accepted to and is enrolled to begin medical school at Rush University in Chicago later this month. This imminent and significant life event demonstrates Ms. Feyock's commitment to lawful pursuits and professional achievement, provides a strong incentive for Ms. Feyock to appear for trial, suggests that Ms. Feyock has the intelligence, discipline, and motivation to comply with release conditions, and indicates that Ms. Feyock's alleged conduct may have been a temporary lapse in judgment rather than reflective of her character or future trajectory.

Ms. Feyock's current status in serving as a doula of the University of Michigan health system for laboring mothers demonstrate that Ms. Feyock is engaged in lawful, productive pursuits and has developed community ties to the Ann Arbor area. Her current status is particularly significant, as it demonstrates her commitment to healthcare and her ability to work with vulnerable populations in a professional and appropriate manner. The Government's suggestion that Ms. Feyock's work in the University of Michigan health system raises safety concerns is speculative and unsupported. The Government provides no evidence that Ms. Feyock has ever harmed or threatened any patient, or that she poses any danger to patients in her care. Id. at Page 21-23.

The Government's brief repeatedly highlights Ms. Feyock's association with student protest organizations including SAFE and the TAHRIR Coalition. Participation in campus protest organizations, attendance at teach-ins and encampments, and posting on student organization social media accounts are activities the First Amendment specifically protects. *See NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982). Courts have consistently held that associating with an organization that some members have used to commit unlawful acts does not, standing alone, render that association criminal. The First Amendment prohibits guilt by association, and the Government cannot weigh Ms. Feyock's political associations against her in a detention proceeding without running headlong into that constitutional prohibition.

### B. Nature and Seriousness of Danger to Any Person or Community if Released

The passage of time only "becomes less significant when the crime at issue is ongoing or continuous and the place to be searched is a secure operational base for the crime." *United States v. Hython,* 443 F.3d 480, 485 (6th Cir. 2006) (citing *United States v. Henson*, 848 F.2d 1374, 1382 (6th Cir. 1988)).

All alleged conduct occurred between October 2023 and April 2025-over one year ago for the most recent allegations, and over two years ago for the earliest allegations. Government's Brief, ECF No. 42, Pages 21-22. The Government's brief relies heavily on private communications from May 2024, over two years old. Id. at Page 21. The recency of criminal conduct is relevant to assessing whether a defendant currently poses a danger to the community. The most serious physical acts allegedly committed by the conspiracy occurred in October-November 2024, approximately 20 months ago. Id. at Page 22. The temporal distance between the alleged conduct and the detention hearing suggests that any danger posed by Ms. Feyock may have diminished over time. Moreover, Ms. Feyock has been under investigation and surveillance since at least April 2025. Id. There is no allegation that Ms. Feyock has engaged in any criminal conduct since April 2025. This suggests that Ms. Feyock may have ceased her involvement in the alleged conspiracy or that her alleged conduct was limited in scope and duration.

The Government's portrait of Ms. Feyock as a present danger to the community rests almost entirely on private communications from May 2024—twenty-five months before this hearing. Courts in this circuit have consistently recognized that stale evidence of dangerous intent loses its force over time, particularly when the defendant has been under active surveillance with no new criminal conduct alleged. *See United States v. Hython*, 443 F.3d 480, 485 (6th Cir. 2006). The Government's own allegations establish that Ms. Feyock's last alleged criminal act occurred in April 2025—over fourteen months ago. She has been under federal investigation and surveillance throughout that entire period, yet the Government does not allege a single new act of criminal conduct. The inference this Court should draw from fourteen months of surveillance without any new allegation is not that Ms. Feyock is presently dangerous—it is that she is not. The

Government cannot simultaneously argue that she poses an acute danger and concede that it has been watching her for over a year while she commits no new crimes.

Further, the Government's arguments regarding Ms. Feyock's dangerousness are largely speculative. The Government suggests that Ms. Feyock's work in the University of Michigan health system raises safety concerns, but provides no evidence that Ms. Feyock has ever harmed or threatened any patient. Id. at Page 23. The Government characterizes Ms. Feyock as believing she is above the law, but does not explain what specific conduct demonstrates this belief, other than her alleged refusal to open the door during the search warrant execution in April 2025. Id. at Page 22. The Government relies heavily on Ms. Feyock's alleged discussions with Korkaya about hypothetical violent acts. Id. at Page 21. However, discussions about hypothetical scenarios, even if crude or offensive, are not evidence of actual dangerousness. The Government provides no evidence that Ms. Feyock has taken any steps to carry out these hypothetical scenarios, or that she has the means or intent to do so.

### III. The Government Cannot Bootstrap Ms. Feyock Into the Worst Acts of Others Without Specific Proof

The statutory framework under 18 USCS § 3142 that governs pretrial detention demands an individualized assessment of each defendant's conduct and circumstances. The Government cannot satisfy its burden by attributing to Ms. Feyock the most serious acts committed by other members of the alleged conspiracy without specific proof that she personally engaged in or directly facilitated those acts. The statute requires consideration of the nature and seriousness of the charges, the weight of the evidence, the defendant's ties to the community, and the nature and seriousness of the risk of obstruction of justice or danger to the community. This framework requires that detention decisions rest on evidence particularized to the individual defendant, not on

a generalized theory that membership in a group or association with certain individuals renders detention appropriate.

The Government's brief describes serious physical acts allegedly committed by the broader conspiracy related to chemical jars, broken windows, nails, and graffiti. Government's Brief, ECF No. 42, Pages 206-219. However, the Government does not specifically allege that Ms. Feyock personally carried out the majority of these vandalism or chemical attacks. Id. at Pages 20-23. This evidentiary gap is fatal to any detention theory premised on the dangerousness of group conduct. To justify detention based on alleged group violence, the Government must establish through specific evidence that the defendant either committed those acts, directed others to commit them, or made a knowing and substantial contribution to a conspiracy to commit them. The Government has not made such allegations regarding Ms. Feyock's participation in the majority of the physical acts. Absent such proof, attributing the group's violent acts to Ms. Feyock would violate the individualized assessment requirement.

## IV. Private Rhetoric Does Not Constitute Prosecutable Threats Under the First Amendment

"True threats of violence are outside the bounds of First Amendment protection and punishable as crimes." *Counterman v. Colorado*, 600 U.S. at 69. "The State must show that the defendant consciously disregarded a substantial risk that his communications would be viewed as threatening violence." *Id*. In *United States v. Alkhabaz*, 104 F.3d 1492 (6th Cir. 1997), the Sixth Circuit affirmed dismissal of a § 875(c) indictment where the charged communications consisted of disturbing private e-mails between the defendant and another person describing violent fantasies. *Id*. at 1496. The court held that even if a reasonable person could view the communications as serious expressions of intent to inflict harm, they were not "communications containing a threat" because they were not conveyed to intimidate the putative victim or to achieve

some goal through intimidation. *Id*. Rather, they were private exchanges between like-minded correspondents. *Id*. See also, *Porter v. Ascension Par. Sch. Bd.,* 393 F.3d 608, 617-18 (5th Cir. 2004).

That controlling Sixth Circuit precedent directly governs the weight this Court should assign the Feyock-Korkaya communications. Those messages were private exchanges between two individuals—not communications directed to or transmitted toward any victim. Under *Alkhabaz*, private communications between like-minded correspondents describing violent fantasies—even disturbing ones—do not constitute actionable threats under § 875(c) because they were not conveyed to intimidate any victim or to achieve any goal through intimidation. The Government cannot bootstrap those private, decades-old messages into evidence of present dangerousness sufficient to justify pretrial detention.

The Government's conspiracy theory also depends on treating Ms. Feyock's participation in campus protest organizations as evidence of criminal intent. The Supreme Court has squarely rejected this approach. In *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982), the Court reversed a civil judgment against the NAACP arising from a boycott campaign that included inflammatory speeches and some acts of violence by unnamed participants. The Court held that liability could not attach to the organization merely because it organized the protest and some participants engaged in violence. Criminal liability requires a still more demanding showing of direct personal involvement in, or specific facilitation of, the criminal acts. The Government cannot satisfy that burden here by citing Ms. Feyock's membership in student protest organizations or her participation in lawful political advocacy. Associating with an organization that some members may have used to commit unlawful acts does not, standing alone, make that association criminal.

("Private writings made and kept in one's home enjoy the protection of the First Amendment, as well as the Fourth. For such writings to lose their First Amendment protection, something more than their accidental and unintentional exposure to public scrutiny must take place.").

The Government relies in part on alleged private violent rhetoric exchanged between Ms. Feyock and Korkaya in May 2024. Government's Brief, ECF No. 42, Page 21. This evidence is problematic for multiple reasons. First, the rhetoric is approximately two years old at the time of the detention hearing. Such staleness diminishes any inference that Ms. Feyock poses a current danger to the community. Detention decisions must rest on evidence of present dangerousness, not on dated communications that may reflect temporary emotional expressions rather than fixed intent to commit future crimes. Second, and more fundamentally, crude private rhetoric does not automatically constitute a prosecutable threat under the First Amendment. In *Counterman v. Colorado*, the Supreme Court established that the First Amendment requires the government to prove the defendant acted with at least recklessness as to whether the communication would be perceived as a threat. The Court adopted a recklessness standard to balance free expression interests against the need to prosecute true threats. *Id*. Private violent rhetoric exchanged in the context of political activism, even if crude or inflammatory, does not necessarily meet this threshold.

The Government must demonstrate that Ms. Feyock's statements were made with knowledge of the risk that they would be interpreted as threats of imminent lawless action, not merely that the statements used violent language or expressed anger. Without such a showing, relying on private rhetoric to justify detention improperly conflates protected political expression with prosecutable criminal conduct.

**V.      This Court Should Guard Against the Chilling Effect of Detention in a Politically Charged Case**

This prosecution does not arise in a vacuum. It follows years of controversy over the University of Michigan's response to pro-Palestinian student protest—including the Michigan Attorney General's prosecution of similar activists, which was dropped in May 2025 after being described as a "lightning rod" of contention. It arises amid a national administration that has openly targeted pro-Palestinian campus activism and pressured universities to punish student protesters. The Council on American-Islamic Relations (CAIR-MI) has observed that this indictment "appears to include extensive references to larger political events, protected viewpoints, and advocacy activity that are not, by themselves, the conduct for which the defendants are being prosecuted." When detention is sought against a defendant charged with speech-adjacent offenses in a politically charged environment, this Court must be especially vigilant that it is not being asked to detain someone because of her viewpoint rather than her conduct. "Criminal prosecutions should be based on alleged criminal acts—not on protected speech or association."

The risk extends beyond this case. If participation in a protest movement can be presented as part of a criminal narrative because of the political viewpoint expressed, it will discourage students and community members from engaging in peaceful advocacy on any controversial issue. Pretrial detention of a defendant engaged in political advocacy, even controversial advocacy, sends a message the First Amendment cannot tolerate: that the price of speaking out on disfavored causes is imprisonment before trial. *See United States v. Salerno*, 481 U.S. 739 (1987) (detention must be based on evidence of the particular defendant's present dangerousness, not on association with a movement or group ideology). This Court should weigh that constitutional concern heavily in assessing whether the Government has met its burden under the Bail Reform Act.

**VI.     Tailored Release Conditions Can Reasonably Assure Ms. Feyock's Appearance and Community Safety**

Even if the Court finds that Ms. Feyock poses some risk to the community, the Bail Reform Act requires that the Court consider whether no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community. 18 USCS § 3142 provides for a range of release conditions that can be imposed to mitigate identified risks. These conditions, individually or in combination, could reasonably assure both Ms. Feyock's appearance and the safety of the community.

Even with respect to the Count 9 witness tampering allegation, tailored release conditions can reasonably assure both the safety of any person and the integrity of the proceedings. A condition prohibiting Ms. Feyock from contacting, communicating with, or attempting to contact any witness or co-defendant would directly address any concern regarding witness tampering or intimidation. Monitored communications and device restrictions can be imposed to ensure compliance with no-contact provisions and to detect any attempt to influence witnesses or co-defendants.

The mere financial ability to flee is not equivalent to an inclination to flee and cannot alone justify detention. Ms. Feyock's Enrollment in medical school at Rush University next month provides a powerful incentive to remain in the jurisdiction and appear for all court proceedings. She cannot attend medical school while incarcerated or while a fugitive.

## CONCLUSION

WHEREFORE, for the foregoing reasons, Defendant Paige Elizabeth Feyock respectfully requests that this Court:

a)  DENY the Government's request for detention;

b)  RELEASE Ms. Feyock on bail pending trial, subject to appropriate conditions as the Court deems appropriate.

Respectfully Submitted,

/s/CYRIL C. HALL (P29121)

_____

Attorney for Defendant-3 Feyock
23950 Princeton Street
Dearborn, MI 48124
(313) 788-8888

## CERTIFICATE OF SERVICE

I hereby certify that on June 12, 2026, I served a copy of the foregoing Defendant Paige Elizabeth Feyock's Brief in Opposition to the United States' Brief in Support of Detention Hearing set for June 12, 2026, in the above-captioned via this court's electronic filing system CM/ECF to:

JEROME F. GORGON JR.,
United States Attorney
s/Margaret M. Smith
Assistant United States Attorney
Sarah Resnick Cohen, AUSA
Robert Kuhn, AUSA
211 W. Fort Street, Suite 2001
Detroit, MI 48226
Phone: (313) 226-9135
E-Mail: margaret.smith@usdoj.gov
Bar No. P71413

/s/Cyril C. Hall_____