UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA,

Plaintiff,

vs.

D-1 ZAINAB ALIASGAR HAKIM Case No. 26-20306
D-3 PAIGE ELIZABETH FEYOCK
D-5 JONATHAN HONGRU ZOU
D-8 COLIN HUNTER WEGER,

Defendants.
_______________________________/

**DETENTION HEARING**

BEFORE MAGISTRATE JUDGE ANTHONY P. PATTI
United States Magistrate Judge
Theodore Levin United States Courthouse
231 West Lafayette Boulevard
Detroit, Michigan
Friday, June 12, 2026

APPEARANCES:

| | |
|---|---|
| For the Plaintiff United States of America: | MARGARET M. SMITH<br>United States Attorney's Office<br>211 W. Fort Street<br>Suite 2001<br>Detroit, Michigan 48226-3220<br>313-226-9135<br>Email: Margaret.Smith@usdoj.gov |
| Also Present: | SPECIAL AGENT SEAN LOBAR, FBI |
| For the Defendant D-1 Zainab Aliasgar Hakim: | AMANDA N. BASHI<br>Federal Community Defender Office<br>613 Abbott Street<br>Suite 500<br>Detroit, Michigan 48226<br>313-967-5845<br>Email: Amanda_bashi@fd.org |
| Also Present: | REBECCA HARLA<br>Pretrial Services Officer |

(Appearances continued next page)

APPEARANCES: Continued

For the Defendant D-3 Paige Elizabeth Feyock:
CYRIL C. HALL
Hall Makled, PC
23950 Princeton St
Dearborn, Michigan 48124
313-788-8888
Email: Chall@hallmakled.com

Also Present:
MATTHEW WEILAND
Pretrial Services Officer

For the Defendant D-5 Jonathan Hongru Zou:
ARTHUR J. WEISS
30445 Northwestern Highway
Suite 225
Farmington Hills, Michigan 48334
248-855-5888
Email: Arthurweiss@Ajweisslaw.Com

Also Present:
REBECCA HARLA
Pretrial Services Officer

For the Defendant D-8 Colin Hunter Weger:
JONATHAN M. JONES
32398 Woodward Avenue
Royal Oak, Michigan 48073
248-310-3399
Fax: 248-397-8661
Email: Jjonescrimlaw@comcast.net

Also Present:
DANIEL ROBERTS
Pretrial Services Officer

To obtain a certified copy of this transcript, contact:
Linda M. Cavanagh, RPR, CRR, RMR, CRC, RDR
Official Court Reporter
(313) 234-2616 • www.transcriptorders.com

**TRANSCRIPT PRODUCED FROM DIGITAL VOICE RECORDING**
**TRANSCRIBER NOT PRESENT AT LIVE PROCEEDINGS**

TABLE OF CONTENTS

Page

DETENTION HEARING:

Proffer by Ms. Smith re Zainab Aliasgar Hakim........7
Proffer by Ms. Smith re Paige Elizabeth Feyock......11
Proffer by Ms. Smith re Jonathan Hongru Zou.........13
Proffer by Ms. Smith re Colin Hunter Weger..........14

Argument by Ms. Smith re all defendants.............19

Letter from Jewish Federation of Detroit read into the record by Ms. Smith.............................27

Defendant 1 Zainab Aliasgar Hakim:

Argument by Ms. Bashi...............................30
Rebuttal Argument by Ms. Smith......................42
Comments/Ruling by the Court........................49

Defendant 8 Colin Hunter Weger:

Argument by Mr. Jones...............................66
Rebuttal Argument by Ms. Smith......................68
Ruling/Comments by the Court........................72

Defendant 3 Paige Elizabeth Feyock:

Argument by Mr. Hall................................83
Rebuttal Argument by Ms. Smith......................87
Rebuttal Argument by Mr. Hall.......................88
Comments/Ruling by the Court........................91

Defendant 5 Jonathan Hongru Zou:

Argument by Mr. Weiss..............................100
Rebuttal Argument by Ms. Smith.....................108
Rebuttal Argument by Mr. Weiss.....................109
Comments/Ruling by the Court.......................110

EXHIBITS

| Identification | Marked | Received |
|---|---|---|
| Exhibit A<br>Flight info re Zainab Aliasgar Hakim | 9 | |

Detroit, Michigan
Friday, June 12, 2026

_ _ _

(Proceedings commenced at 2:15 p.m., all parties present)

THE CASE MANAGER: Court calls Case 26-20306, United States of America versus Zahib -- Zahib -- Zahib -- I'm sorry.

THE COURT: Zainab.

THE CASE MANAGER: Zainab Hakim, Paige Feyock, Jonathan Zou and Colin Weger.

MS. SMITH: Good afternoon, Your Honor. Maggie Smith appearing on behalf of the United States.

THE COURT: Afternoon.

MS. BASHI: Your Honor, would you like all defense counsel and our clients to stand?

THE COURT: I don't think it's necessary for everyone to stand all at the same time. We'll have kind of chaos if we do that.

MS. BASHI: I agree.

THE COURT: So I think defense counsel may sit, and then they'll make their each -- they'll make presentations and they can stand with their client if they like, okay?

MS. BASHI: Okay. Thank you, Your Honor.

THE COURT: All right.

MS. BASHI: Amanda Bashi from the Federal Defender

Office on behalf of Zainab Hakim.

THE COURT: All right. Let's get all the other appearances.

MR. HALL: Thank you, Your Honor. Cyril Hall on behalf of Defendant -- Defendant No. 3, Feyock.

THE COURT: I'm sorry?

MR. HALL: Feyock.

THE COURT: Okay. Thank you.

MR. WEISS: Good afternoon, Your Honor. May it please the Court, Arthur Weiss on behalf of Mr. Zou.

MR. JONES: And I'm Jonathan Jones on behalf of Mr. Weger.

THE COURT: Thank you.

MR. JONES: You're welcome.

THE COURT: Okay. All right. So the government is going to make a common presentation I think to start, and then -- then I'm going to -- and you can -- then I want you to individualize it and tailor your arguments. You'll give some proffer for each individual I'm sure, but then tailor your arguments to that individual, and then I'll turn to their counsel for them to respond. So we're going to do it one at a time in that sense, but I know there's a common set of facts that you want to get out there first.

MS. SMITH: Yes. Do you want me to argue as well or hold the argument until after they present their comments?

THE COURT: Well, normally I have you go right on to argument, and if you were going to be directing it to a particular defendant, then -- then go on to argument. So does that make sense?

MS. SMITH: Yes, I will do that.

THE COURT: Okay.

MS. SMITH: Your Honor, we -- are you ready for me to begin?

THE COURT: Yes.

MS. SMITH: We are seeking these defendants' detention. We are eligible for a hearing under 3142 parens (f) parens (2) parens capital (A) and capital (B), that there is a serious risk of flight here, and there's also a serious risk that a person will obstruct, attempt to obstruct justice, threaten, injure, intimidate, or attempt to do so, prospective witnesses. I would point out that the underlying crime to these conspiracy counts is using the Internet to transmit a threat, 18 United States Code Section 875(c), which is a crime of violence.

The facts and argument that I intend to present today are not necessarily what would be presented at trial. I trust the Court has read the indictment.

THE COURT: Yes.

MS. SMITH: And I know the Court has read the memo of facts that -- that we filed yesterday as well. And so just to

be clear, the facts and the arguments that I make today have to do with whether or not these defendants present a risk of flight or a danger to the community. And the -- the question I think the Court is going to grapple with is will these defendants follow any court-ordered bond conditions, and the answer is no. And part of that argument is largely the same for each individual, but what I want to proffer today are the individual facts and Pretrial Services Reports, I want to proffer what Special Agent Sean Lobar with the FBI would testify to, and then I have a statement from the Jewish Federation of Detroit who have a right to be heard under 18 United States Code Section 3771 parens (a) parens (4).

And so I did individually go through these defendants in the memo that I filed, so I think -- I think how we should most efficiently use the time is to go through the additional facts that I have not already put to writing, if that's okay with the Court.

THE COURT: Yes.

MS. SMITH: So when we look at Zainab Hakim, Defendant 1, she has proven herself to be a leader in this organization or what they like to call a revolution. According to the Pretrial Services Report, she is living with a codefendant, who is Defendant No. 2, who is not here because she's currently out of the country in India where her family has substantial ties.

She is also involved in a dating relationship with an unindicted coconspirator. This unindicted coconspirator is here in the courtroom today, and he has probably figured out what number he is in the indictment, but I have not -- I'm not going to reveal that on the public docket.

But I can say that in terms of some of the facts that the Court ought to know, aside from everything else, is that this -- this boyfriend, last name is Shapiro, has made contact in the last 24 hours with all of these defendants sitting before you today. He has been arranging and coordinating group conversations along with Defendant 3, Paige Feyock's, roommate who is also an unindicted coconspirator, and there has been some chatter about their civil lawyer going on a podcast today to talk about this case. It was, quote, "Popular podcast."

And they -- you should also know that Zainab Hakim and Shapiro are scheduled to fly out of the country at 10:15 tomorrow morning, and I verified this with Homeland Security records. They both have a one-way flight 10:15 tomorrow to fly to Canada. It's a one-way ticket. I don't know where they plan to go after they go to Montreal, but I can proffer to the Court that it's not uncommon for international travelers to go to Canada first and then to go to other countries after that. I think the Court should know these tickets were purchased before yesterday but they are one way, and -- and I think that's important for the Court to know.

This defendant has not only read the charge, but as I proffered, her loyalty and ties to --

MS. BASHI: Your Honor, I apologize. I -- I would not do this often in a bond hearing but I am going to object. I did ask for anything the government would be relying on.

MS. SMITH: I just got it in court.

MS. BASHI: And that representation is factually incorrect. If I -- I would like notice of that information so that I can provide the Court with that.

THE COURT: All right. It's noted and it looks like it's been handed to you.

MS. SMITH: Yeah, it was handed to me while we were in court today, but it is a record from the U.S. Customs and Border Protection of their ticket and itinerary. May I hand up a copy to the Court?

THE COURT: Yes.

MS. SMITH: And we can mark this as Exhibit A.

(Brief pause)

Please let me know when I may proceed.

THE COURT: Okay. Just a moment.

(Brief pause)

These seem to be the same thing, what I've got. Should there be two different things here? At least they're the same person.

MS. SMITH: I might have another copy of the other

person's itinerary as well. They're -- they're identical.

THE COURT: What I have is the -- the male's.

MS. SMITH: You're right, you're right, you do. Let me -- let me hand up the other one. I apologize for that.

(Brief pause)

THE COURT: Okay. It shows a departure time of 10:15 a.m. from Detroit to arrival location YUL. I take that to be the Montreal airport code?

MS. SMITH: Montreal International Airport.

THE COURT: Okay. All right. Thank you. You may proceed.

MS. SMITH: Thank you.

And so one of the things that -- that this particular defendant -- another fact that I want to proffer that I touched on in the memo is that she appears to be the leader of this sort of revolution organization, and she's also tasked with or -- or likes to create some chants for people to give at protests.

And to be clear, and I think I've said this over and over again, nobody is being sought to be punished for their -- for what they think or what they believe, but it's important for the Court to understand where these defendants see American citizens and how they view law enforcement and their hatred toward people who are Israeli or Jewish. For example, one of the chants that she created was quote, "settlers, settlers,

does it hurt, Iran will turn your state to dirt. Listen to Hamas and Yemen, your time for dancing's finally ended." And the dancing refers to the Nova music festival slaughter of October 7th, 2023 where Hamas and other militants murdered 378 young people. There was another chant in the memo about the Al-Qassam Brigades who is the military arm of Hamas.

I will save the rest of -- of that piece for argument and move on to Defendant 3, Paige Feyock. She has involved herself in a number of these incidents, which I don't -- I don't mean to downplay how terrible those incidents and postings were because I'm not talking about them, but I know the Court has already read and has the information in front of it with the photos of these particular attacks and threats from the indictment.

And it -- it seems that Pretrial Services has indicated that she plans to move to Chicago to attend medical school beginning June 21st, 2026, and she plans on going there with an unindicted coconspirator who I believe is here in the courtroom today and was arranging for -- or on group phone calls as -- as late as yesterday with another unindicted coconspirator.

She is a dual citizen of Germany and holds both a United States and a German passport.

And I want to point out that the -- the -- the words that appear attributed to Ms. Feyock in these documents are

absolutely inflammatory, but they were not created by the United States. They came out from her mouth, they came out from her messaging. She is the one that supports marking people for death. She is the one that -- that quoted the term "intifada." She is the one that talks about and suggests burning a cross on a "brown" professor's lawn to, quote, "send a message." And she is the one that talked with Defendant Korkaya about forming a domestic terrorism group like the Weather Underground of the 1960s.

She is working in a medical facility, or has, and she has also been involved with pregnant women and served as a doula for -- and -- and I believe she's in -- was in, if not still is, the University of Michigan's Health System.

And my factual proffer that I think I put in the memo is that she and Korkaya also discussed a civic duty to blow up a pro-life club at the University of Wisconsin.

THE COURT: Was there any evidence that they took any steps towards doing that?

MS. SMITH: Towards bombing? No.

THE COURT: Yes.

MS. SMITH: I will now turn to Jonathan Zou who has been charged with --

THE COURT: And when did they discuss that?

MS. SMITH: Oh, I'm sorry. It would have been in 2024.

THE COURT: Okay. Next?

MS. SMITH: Thank you.

Jonathan Zou has been charged of the -- three of the incidents that occurred on October 7th, 2024. As I noted, he was also involved in the destruction of First Financial and Raymond James. That is uncharged conduct.

According to Pretrial Services Reports, he -- most of his family lives in China. He claims not to have dual citizenship, but the Court should know that he was allowed to stay in China for 15 years and his parents both live there, one I believe in Shanghai and the other in Wuhan, and so even if he doesn't have dual citizenship, he certainly is welcome to be in that country for extended periods of time.

This is the defendant who joked about having Jews for Jihad.

He also was involved in some of these -- or at least one of these -- well, excuse me. He was also arrested for obstructing police during a campus ban and -- I'm sorry, during a protest he was arrested for obstructing police, which is not an uncommon event with these -- with these conspirators because they give each other training on how to unarrest somebody. And if the Court has never heard what an unarrest is, it means to physically pull a -- an individual who police are trying to put in custody, to overtake the police and physically pull that person out of the arms of the police. He was arrested for

obstructing the police, U of M campus banned him, and instead he decided to dress up like a Muslim woman and sneak around campus while the conspirators laughed about it and thought it was funny that he was thwarting law enforcement.

Colin Weger. Colin Weger has been charged with Counts 3 and 4 regarding Rolls Royce and Maersk. As I noted and as the Court has read, Mr. Weger is mechanically inclined. He engaged in discussions about destroying C-A-T machines, which are heavy-duty construction equipment, and -- and doing some significant damage to them.

THE COURT: Any -- any evidence that he took any steps in that direction?

MS. SMITH: Well, he participated at Rolls Royce and Maersk.

THE COURT: Okay. And -- and tell me what he did there.

MS. SMITH: He was a participant in the destruction of the building — the Court has photos in the memo — the -- the spray painting of the messages. There were at various locations doors that were caulked shut. There were bike locks locking the front door. At one of these two locations there was staff inside the building when it occurred. And then those two incidents appeared on social media posts with additional messaging after -- shortly after it occurred.

THE COURT: You said Rolls Royce and where?

MS. SMITH: Maersk. It's --

THE COURT: Oh, Maersk, yeah.

MS. SMITH: Maersk is Count 4, mm-hmm.

THE COURT: Uh-huh. So what they -- what -- what they actually -- what he actually did was essentially heavy vandalism there?

MS. SMITH: Yes.

THE COURT: Is that right?

MS. SMITH: Yes, besides -- yes, as part of that, yes.

THE COURT: Right. But in terms of you -- you talked about -- talked about this doing some destruction of was it CAT equipment?

MS. SMITH: CAT equipment, correct.

THE COURT: Okay. I once took a deposition over at the CAT facility and learned more than I ever wanted to know about.

But -- but what steps did he take, if any, towards that? Did he purchase anything, did he buy any explosives, create anything? What -- what exactly --

MS. SMITH: Well --

THE COURT: -- did he talk about doing and what did he -- he actually take in terms of steps to do it?

MS. SMITH: What we know from the evidence that we have is that he was very eager to start the research project on

how he could destroy CAT machines as well as get into what they term the "weapons corridor" in the middle of Michigan and try to start targeting manufacturers who they believe are involved in weapons. Did he actually destroy a CAT machine? I don't have evidence of that standing here today, but I do know that he was absolutely willing to participate in that.

THE COURT: You say that in the past tense. So when did he express that eagerness to start research towards that destruction?

MS. SMITH: It would have been -- the -- well, maybe it's helpful for the Court to know that the information that we have from this group is through April of 2025 when phones were seized. And the conspirators right after that obtained new phones, some obtained new phone numbers, and all of them stopped backing up their phones on the iCloud because they had -- they were very in tune with what law enforcement may be able to find out. And so -- and so the information that we have is a little bit dated. I don't know what -- what may or may not have happened.

I do know that there have been additional instances of vandalism. I'm not asking the Court to speculate that it's tied back to this group. I know that they're still active on their social media, and within a half an hour of our arrests on Wednesday morning, there was a call for protest to come to this courthouse and pack the courthouse as they like to say.

What I do know about Mr. Weger is that when the search warrant was executed at his house, agents did find some marijuana in his -- under his bed. They found mushrooms and they found -- not cooking mushrooms, but mushrooms along with the marijuana, as well as some substance that was wrapped in tinfoil that I instructed them not to open because it was in the same area. Now, he did tell Pretrial Services that he doesn't do any drugs, but what was found is -- is relevant I think for the Court.

You should also know that this defendant has purchased since 2024 an AK-47 and a silencer. I point that out because the silencer alone is $800 retail, not to mention AK-47s are generally about a thousand to $1,200. For a young student who's making I think he said $3,000 a month, I think that's something the Court ought to consider.

But in my memo what I also thought was more -- what was something the Court should be aware of is the $400 worth of patches and military paraphernalia representing terrorist organizations including Hamas, including the Chinese Socialist. A number of them are listed in that -- in that memo.

And when you combine an AK-47 along with the tactical gear that we know he purchased, to include glow-in-the-dark paint for his sight on his AK-47 and the silencer, as well as range time that he has purchased, and the fact that he has -- has a heavy interest in terrorism patches and paraphernalia,

none of which were found at the house he's residing at, and so I'll save rest of that for argument, but we do not know where any of that is at this moment in time.

THE COURT: When was the purchase of the AK-47?

MS. SMITH: 2024.

THE COURT: What month?

MS. SMITH: February. But the range time has been as -- as late as 2026.

THE COURT: Okay. And then you said he painted the scope on the AK-47

MS. SMITH: Well, he purchased glow-in-the-dark paint --

THE COURT: Okay.

MS. SMITH: -- that is designed to be painted on a -- on a sight or a -- or a scope on a weapon. It's designed to glow in the dark on your firearm.

THE COURT: And what's the purpose of that?

MS. SMITH: Common purpose would be if you were being -- if you were shooting at night.

THE COURT: Okay. That's it, right?

MS. SMITH: Yes. I can't --

THE COURT: So -- so you can shoot at night. All right.

MS. SMITH: -- I can't fathom a situation where -- a gun range certainly is not going to have nighttime shooting

sessions.

THE COURT: Okay.

MS. SMITH: I am ready to proceed to a general argument if the Court wants me to do so.

THE COURT: You may.

MS. SMITH: Okay. And so I think that what we've presented to this Court shows that these defendants have something in common here, and that is an extreme violent view directly tied to terrorism. These individuals have shown no empathy for their enemies; they have only hate. And that is exemplified in message after message after message, and including Jonathan Zou and others that subscribe to newsfeeds directly from Hamas that just flood their phones with -- with messages dehumanizing Israelis and Jews, and it is to the point where they -- these individuals have justified in their mind calls for murder.

Now, I -- make no mistake here, they can hate whoever they want. They can hate Jewish people, they can hate white people, they can hate Americans, and they can chant "Death to Israel" on the courthouse steps. But what they cannot do is violate the law, they cannot obstruct justice, they cannot destroy people's homes, and they cannot post threats online to send a message to their victims.

And the question the Court needs to grapple with today is how can you trust that these defendants will listen

and follow court orders when, one, they openly reject the notion of law enforcement. Two they categorize human life by nationality and country affiliation. Three, they believe that the government is fascist and have absolutely no respect for the law that they don't believe in. They believe we are fascists, we are colonialists, and the law just does not apply to them. And these defendants are almost to the point of obsessed with this oppression campaign, and it's almost all they talk about and almost the only thing that they're doing while they're on that college campus.

Now, I know that the last criminal act in the indictment was in 2025, but again I'd ask this Court to consider that we don't know what they've been doing, and you can take that and weigh that however the Court wants. But as I noted, after the search warrants in 2025, where I would point out Jonathan Zou was alerting everybody in this group as well as other people that the FBI were showing up at people's doorsteps to execute warrants, they filmed it, they put it on social media, and they called these illegal searches.

THE COURT: Is there anything illegal about that, that they alerted others that they were about to be raided to and they filmed it?

MS. SMITH: Yes, because they instructed each other to delete them out of their group chats so that we couldn't see what they were talking about.

THE COURT: Okay. Well, that's different, but I'm asking about just alerting people to the fact that -- that there was a search going on, they were likely to also be searched.

MS. SMITH: That -- that, in and of itself, I don't think is illegal, no. But the following text messages of "take this person out of the chat, take this person out of the chat" was occurring in a rapid pace between 6:00 a.m. and -- and 7:30 a.m.

THE COURT: And that was Mr. -- Mr. Zou?

MS. SMITH: He was one of them. And then Defendant Alex Sepulveda's then-girlfriend, also an unindicted coconspirator, she got -- she got word, and Sepulveda disappeared for six hours and then showed up and turned over empty devices to law enforcement, and that is what his Count 10 is in the indictment, for destruction of property to prevent lawful seizure.

So I -- I -- what I want the Court to consider is that even if the Court believes that things should have moved faster or -- or that we should present some newer sorts of evidence, I would ask the Court to consider the fact that this -- this is a sophisticated group, and it -- it took some time to crack into their encrypted devices. It took a couple of different angles to get the information that we needed.

And the answer to that is not to place the community

at risk because somebody thinks the government may have acted too slow. The analysis is, standing here today, can the Court fashion reasonable conditions to assure their presence and the safety of the community, and the answer to that is no, particularly now with this indictment.

And this group has expressed and had a powerful incentive to ignore the law, and it is because they believe they've done nothing wrong. They believe that they are taking up a cause and they're being punished for being pro-Palestinian. And they have a history of police combat, and they will not stop communicating with each other in terms of what stories they're going to say or how they're going to proceed. And that evidence, even within the last day, they're talking to each other on the jail calls and they aren't -- they cannot even go 12 hours without being in communication because they believe they're part of this revolution that is -- one, that is pro-Hamas and that is justified in what they are doing.

And -- and the fact that the protesters are here, and there's many in the courtroom, these are not supporters for following the Court's orders. These are supporters who have that same groupthink mentality of we are -- they are being punished for First Amendment speech or for supporting Palestinians, and that's not why we're here today. They believe they're part of a revolution, and the support they will provide is to assist with hiding, obstructing and carrying on

their bidding. And you combine that with the number of people who are willing to drop everything and show up at a courthouse for a case they've likely never read the indictment for should be of concern to this Court.

THE COURT: No, it's not a concern to the Court that people have a public interest in what happens in a court of law in the United States.

MS. SMITH: They do.

THE COURT: It's not of concern to the Court.

MS. SMITH: They do. And they have a right to protest.

THE COURT: Yes, they do.

MS. SMITH: They have a right to protest.

THE COURT: Yeah.

MS. SMITH: The argument that I'm making concerns the nature and characteristics of these particular defendants and their -- and whether or not they will listen to court orders if the Court issues them a bond.

THE COURT: None of them have a criminal history, correct, or if -- if any, there might be one that has a minor criminal history, am I right?

MS. SMITH: Correct.

THE COURT: Okay. I'm -- I'm curious because it's hard for me to sort it out. There's a lot of paper in front of me. The indictment is very long, and then I got long briefs on

top of that. Mr. Hall, you need to do your briefs in 14.5, by the way, per court rule. You didn't.

But at any rate, there was various threats to homes and businesses, I understand that. And there was one in particular from the indictment I understand was to a -- what, a university regent's house, is that correct?

MS. SMITH: More than one, yes.

THE COURT: Okay. And there was one where some sort of chemical was dropped into someone's home, is that right?

MS. SMITH: That occurred in two to three locations.

THE COURT: Okay. Chemical dropped into house.

And what I'd like to know is what evidence is there of any of these particular four people being directly involved in that?

MS. SMITH: We have their -- we have their phone records and their chats discussing the planning. We have their -- in some instances we have their phones putting them directly at those -- at those incidents. And I can proffer to the Court that the way this indictment is -- is structured, the people who were charged in the conspiracy, in the count, we have evidence that they were either directly on site or they provided the off-site intelligence during these incidents.

THE COURT: Okay. And that -- what I want to know is the directly on site part. What -- which of these, if any, were directly on site where someone's home was breached and

chemicals were tossed in?

MS. SMITH: Every person named in their counts in the indictment were directly on site with the exception of Paige Feyock. We do not know if she was directly on site or driving a car to the site, but we know she directly participated by using the police scanner, planning out routes, and helping direct the activities. Everybody else we have -- for each count we have proof that they were present at the location.

THE COURT: What were the chemicals?

MS. SMITH: I'm sorry?

THE COURT: Do you know what the chemicals were?

MS. SMITH: Yes. Well, the one jar that was tested came back as butyric acid, which does not rise to the level of -- of a federal chemical substance that's chargeable, but it is very odiferous and it's also in these bombs. And the bomb making, if you will, are in a magazine, an underground magazine that I noted in the memo called *Monkeywrenching*, which teaches anarchists how to commit criminal acts without detection, and so that -- that lesson is in that book that was in Zainab Hakim's device.

THE COURT: So how many regents' homes were breached?

MS. SMITH: There --

THE COURT: I'm talking breached, not -- you know, not spray-painted but actually breached.

MS. SMITH: Well, if you're talking about broken

windows --

THE COURT: Yeah.

MS. SMITH: -- or what actually landed in, it was a U of M police sergeant who was involved in some of the arrests during the encampment, and it was two -- one, two regents' locations. One of those locations is not charged as a -- as a full count.

THE COURT: And then how many locations were the subject of graffiti or something less than a breach but -- but some sort of defacing?

MS. SMITH: Twelve total that we know of. Two were not charged -- three were not charged in the indictment. Like I said, Raymond James and First Financial was not charged in the indictment, but we know from the evidence -- give me one second and I'll tell you who was present for those.

(Brief pause)

Zainab Hakim, Amatullah Hakim, Jonathan Zou. And those -- those two locations were hit within minutes of each other on...

THE COURT: Which two locations?

MS. SMITH: Raymond James Financial and -- I'm sorry, Raymond James and First Financial. And that was on March 20th, 2025, and those photos and description are in the -- in the memo.

And when Your Honor is ready, I will -- I will close

with the victim statement on behalf of the Jewish Federation of Detroit if I may.

THE COURT: Okay. You may.

MS. SMITH: Are you ready?

THE COURT: Yes.

MS. SMITH: Okay. We received this this afternoon. "Your Honor, on behalf of the Jewish Federation of Detroit, thank you for the opportunity to address the Court.

"We submit these remarks as a victim of the conduct alleged in this case and to speak to the impact of defendants' actions — not only on our institution, but on the broader Jewish community we serve. Today, we respectfully ask the Court to consider the gravity of the alleged conduct: the fear caused, the intimidation felt, and the broader danger posed when hatred directed at the Jewish community is left unchecked.

"Some acts of the alleged conspiracy involving defendants relate to the antisemitic graffiti found outside the Jewish Federation of Detroit on October 7th, 2024 — a date already marked by profound trauma for Jews in Detroit, in Israel, and around the world.

"For our employees and community members, arriving at our building that day and seeing words and symbols aligned with Hamas and its targeting of Jews was terrifying, painful, and experienced as a threat. The trauma of the Hamas [terrorist] attacks ... is not abstract: staff members working in the ...

building and members of the ... Jewish community lost immediate family members in the terrorist massacre.

"The Jewish Federation is the central address of Jewish life in Metro Detroit, housing a number of Jewish institutions and teams advancing Jewish education, facilitating support for vulnerable individuals and families, and serving other communal needs. When that building is targeted with violent rhetoric and antisemitic symbols, it sends a message to every person engaged with Jewish communal life: you are being watched, you are not safe, and you could be next.

"This threat is felt by tens of thousands of individuals and families across our community. It forces people to think twice about where they gather, where they pray, where they send their children to learn. That is a profound harm.

"This is not about speech or protest, but very real threats of harm, physical trespass and vandalism. When such acts of hatred toward Jews are normalized — when intimidation is excused, when threats are minimized, when vandalism is framed as mere protest — it emboldens hostility and forces a community to live under threat for simply existing.

"Thank you for your consideration. We remain hopeful that justice will be served in a way that affirms a simple but vital principal that all people should be able to live, work, gather, and worship in a society free from hate, fear, and

intimidation."

THE COURT: And is there evidence that any of these four individuals were connected, directly or indirectly, to the rhetoric and threats that were placed at the Jewish Federation building?

MS. SMITH: Yes. And that's Counts -- I believe that's Count 6. That was Paige Feyock, Jonathan Zou and Zainab Hakim that are present here. That was either Count 6 or Count 7. Let me... Count 7 --

THE COURT: One moment.

MS. SMITH: -- in the indictment. Other participants were Ahmet Korkaya and Amatullah Hakim who are not present before Your Honor today.

THE COURT: But not Mr. Weger, right?

MS. SMITH: No. At least we don't have evidence at this point of that.

(Brief pause)

That concludes my presentation, Your Honor. I would like to reserve some brief time for rebuttal if the Court requests to hear rebuttal from the United States.

THE COURT: Okay. All right. Thank you.

We'll take them one at a time, so we'll start with the counsel for Ms. Hakim who you can have your client come up with you.

MS. BASHI: Thank you, Your Honor.

THE COURT: Just... okay.

MS. BASHI: Your Honor, we did not file a brief, but I would ask the Court, just for efficiency purposes, to permit me to proceed with combined factual and -- and argument --

THE COURT: Yes.

MS. BASHI: -- presentation.

THE COURT: Yes, please.

MS. BASHI: The Court is already familiar with the Supreme Court's decision in *Salerno,* which often gets quoted at -- at detention hearings but sometimes bears repeating, and that's that liberty is the norm and detention is the carefully limited exception.

And I want to begin where the government's written proffer begins. Its first lines say that this is not about anyone's First Amendment rights or it's not about protest, and that's good, it shouldn't be. The problem is that you read 19 pages later the government makes the conclusion that because Ms. Hakim is -- views the government as, quote, "imperialist," quote, "colonialist," she won't be able to abide by orders of the court. Someone can be anticolonialist, someone can be anti-imperialist, someone can have those views and still abide by court orders where they live.

And I want to be -- you know, what troubles me is the number of things the government has offered even today at oral proffer that they think are I think some kind of bad -- speak

back poorly of Ms. Hakim or of the way they've exercised some of the speech by individuals in the courtroom. The fact that they're present today, the fact that someone's going to talk about this case on a podcast, that's speech. Their right to be here, as the Court noted, is one of the good things about our country.

So the logic of the government's written brief and the logic that it repeats today, if we're to take that seriously, is that one can be denied bond because you view -- because of your views about a government that are negative, and that's not the country we live in and that's not what the Bail Reform -- Bail Reform Act says.

And so I think my -- what I would like to present -- and I think when the government focuses on that in those most extreme and alarming terms possible, it distracts from and doesn't address at all the many things about Ms. Hakim and her life history and her qualities, which are specifically enumerated in the Bail Reform Act that the Court must consider, and those facts here strongly support bond. They're the reason, in part, that Pretrial recommended release and believes it can supervise Ms. -- Ms. Hakim.

I want to also just factually address the issue of the flight that the government raised. My client and I discussed this, I discussed this with her family, all of whom are present in the courtroom, and that flight was the first in

a series of flights on a trip she was taking for two weeks. There are several other flights that were purchased that the government did not provide the itinerary for, including a return flight from Paris to the United States, back to Detroit where she has a job that she has held for the last year that's waiting for her.

I did provide to the Court's clerk two exhibits that I would like to reference. I don't know if the Court has them.

THE COURT: I do.

MS. BASHI: Okay. One of them is Ms. Hakim's resumé and the other is a letter from her employer. I reference the letter from her employer because as you can see from the letter, she, you know, expected, as was planned, for Ms. Hakim to return back to work after her scheduled vacation that she had planned to take.

Ms. Hakim was born in Michigan and has lived her entire life here in the Eastern District of Michigan, without exception. Her mother, her father, her sister, her aunts and her uncles are all present here in the courtroom today. They all live within this district.

Ms. Hakim graduated from the University of Michigan with a 4.0. She completed an honors thesis. She was a National Merit Scholarship recipient. She received the Tappan Award, which is an award they give out in her major, the year that she graduated.

She has worked in full-time or part-time jobs since she was 16 years old, and that includes being a part-time employee at the YMCA, being a tutor, working as a counselor at Camp Mirage. She worked at one point in a samosa factory and in another point in a coffee shop.

And after graduating from U of M, she actually worked for the university in the Center for South Asian Studies. She was abruptly let go from the center due to, in part, some of her protest activities on campus, and as a result, numerous staff from the center, including her supervisors and others, organized around her to ask for the university to reinstate her in that position. More than a hundred people offered her support. And I say this not for the Court to adjudicate the reason she was let go and whether that was appropriate, but to show that she was a respected employee that people wanted to continue working with.

After losing that position she became a full-time library -- librarian media teacher at Taylor Exemplar Academy. That's the one who submitted the letter from the dean of that school, and she talks about what the -- what -- the value she's brought not only to the school but to the students. Talks about her work ethic, talks about how she always shows up on time. She still has that job if she is able to attain bond in this case.

And it might go without saying, I think the Court

raised earlier, Zainab has zero criminal history. And she obviously has exceptional community ties for her entire life and continues to be in this district. I don't think the mere fact of international travel in the past is evidence of a risk of flight. I don't think a planned vacation that's obviously not happening is evidence of a risk of flight.

And if the Court is going to consider that planned trip as a basis to detain Ms. Hakim, I would ask for the opportunity for a recess to obtain the flight receipts that I have been assured are in an email to provide to the Court if the Court plans to detain Ms. Hakim on that basis. I would be happy to take a recess to do that.

Every time Ms. Hakim has traveled, she has come home. Every time she's flown, she's returned. She has never overstayed a visa. She's never failed to return to the United States. She's agreed to surrender her passport today, and without a passport, I think the flight risk to the government -- that the government hypothesizes virtually disappears.

Beyond that, the statute requires that the risk of flight be serious, and I think given Zainab 's strong community ties, zero evidence that she has ever traveled and overstayed a visa or had any plans to stay anywhere outside of the United States, there is no serious risk of flight here, particularly without a passport.

I think the government also mentioned that her sister is currently in India. I wanted the record to be clear she is there on a U of M-sponsored summer program. She also has a return ticket, and -- and without speaking out of turn, I think plans to potentially even return earlier to address the allegations in this case. Regardless, my client's sister's temporary international undergrad program participation should have no bearing on Zainab Hakim's willingness and ability to be present for court and abide by court orders.

She would serve bond at her parents' home in Canton, and that was verified by Pretrial Services.

And I also want to note, as to the government's argument that Ms. Hakim would not abide by court orders or is some risk of flight, every time -- this -- this case and -- and the searches, this has been going on for, as the Court knows, like two years. And every time the agents have come to Ms. Hakim's home to execute a search warrant or an arrest warrant, her and her family have complied, to the point where when they wanted to take every device in the home and did take every device in the home, including Ms. Hakim's father's work laptop, he gave it up and they still have it. I'm told the Attorney General intends to retent [sic] -- return it to them. They didn't find anything on it that was incriminating. It is his work laptop. But I say that to say they do abide by court orders and they have every time they've been presented with

one.

The Zainab that is described by employers and family members and the one that is reflected on that resumé if the Court has time to read it, that has been the great majority of Zainab Hakim's life. What has not been the majority of her life are the very serious allegations in this case, and that's -- really the seriousness of the offense, the offense itself is the only Bail Reform Act factor the government addresses.

Now, they're serious. The charges don't involve firearms or weapons which we see often in federal court. They don't involve attack, personally attacking anybody on their person. They don't involve anyone getting hurt. And they certainly don't involve, although the government invokes the word, anything approaching terrorism. The primary allegations in this indictment are property crimes. And I notice the Court -- you know, obviously there's reference to -- I think in the government's brief they called it a bomb. The liquid inside was -- it's a stink bomb, for lack of a better term. It's a nox -- it's a noxious material. But regardless, the charges are serious.

And at the same time, the government's argument of a present risk to the community is weakened by the amount of time that has passed since the alleged offenses. It's been I think around 15 months since the last act alleged in the indictment.

Now, the government says in response to that, "Well, we don't know what they've been doing in the meantime." The problem is that there are standards of proof and "we don't know" doesn't meet any standard of proof. In that time, what we do know is that Zainab has hurt -- Zainab Hakim has hurt no one. She has not gotten into any trouble. The government hasn't offered any proof that there's ongoing threats.

And because the Court must take an individualized assessment in these cases, I know it's a -- it's a combined hearing, I know there's a conspiracy, but I want to be clear about how the government kind of conflates rhetoric with culpability because it is confusing. Even reading the indictment myself, I had to go back through, especially reading the government's proffer, who said what, who was in the group chat when things were said.

There are some alarming private statements contained in the indictment and in the government's proffer made by codefendants. I think it was Korkaya that discussed in private conversations poison. I think it was Feyock in -- in private conversations that discussed lighting a cross on fire. Those statements are not and cannot be attributed to Zainab Hakim and shouldn't be. I don't -- I can't even tell that they were known, that Ms. Hakim even knew about those statements.

Now, what is alleged as to Ms. Hakim is serious, but it's -- it's different from some of the most violent rhetoric

that's included in the government's proffer and in the indictment.

I want to be mindful of the Court's time, as I said, so I don't want to repeat any of the arguments that were made and -- and briefed by co-defense counsel in their supplemental filing. I assume the Court has read it and reviewed that pleading.

I did want to note that another defendant who's not present here who I believe lives in Chicago — Sepulveda, Defendant 6 — was released on -- I think my reading of the indictment, he is similarly situated to Ms. Hakim. He was released on bond. Even though he lives in a different -- he doesn't have the ties here that Ms. Hakim has, he was released on bond by the Northern District of Illinois and will be appearing here for his arraignment on Monday. And the Court is -- is likely already aware of the other defendant who was released on bond. I do believe the government is appealing that decision.

This indictment, the two nights and two days in jail for Zainab Hakim and for her family have been earthshaking, and I don't think I'm putting it -- I'm overstating that. We are talking about a 4.0 U of M grad whose parents both have worked in the same jobs for 20-plus years. We're talking about someone who has never been in jail. This has been a scary wake-up call for Ms. Hakim and her family. The Court can rest

assured that her and her family are taking this incredibly seriously and that any orders from this Court will be abided by.

Now, I know this case subject matter is a hotly contested, international, longstanding dispute. It -- it inflames people's sense of justice, it inflames emotions, and there's a lot of rhetoric and politicized argument even just in what's been filed in the case by the government already.

I did not intend or want to come to this hearing and talk about that hotly contested -- contested conflict. I don't think the Bail Reform Act includes -- contemplates picking a side in that conflict. But if I give the government the benefit of the doubt, it seems to me that they're sharing all this stuff and invoking these inflammatory things that so clearly don't apply to the actual actions in this case, invoking things like terrorism, putting images next to my client's picture with images found in someone else's phone that are publicly available on the Internet and putting that on the public docket so that there are media articles written about them, using those words.

If -- if the intention behind that is to say, here, look at what violence these young people think about and support, even if that's the intention, there's a problem with that because on the flip side of things, Benjamin Netanyahu is a wanted war criminal in 130 countries. There are more child

amputees in Gaza than anyone else -- anywhere else in the world. And the Internet is rife with content of awful atrocities. I -- I saw a video last Friday of a baby the same age as my own son who had been documented, shot in the head by Israeli forces.

So I -- I don't -- I don't think it's relevant under the Bail Reform Act, I don't think it's relevant to this Court's bail decision today.

MR. HALL: Excuse me, Your Honor.

THE COURT: Yes.

MR. HALL: May I step out for one second?

THE COURT: Yes. You want us to go on without you?

MR. HALL: No, not the government.

THE COURT: No, not the government but...

MR. HALL: Yeah, you can continue.

THE COURT: Okay.

MR. HALL: I'll be right back.

THE COURT: Thank you, Mr. Hall.

(Mr. Hall excused from the courtroom at 3:11 p.m.)

MS. BASHI: I just think that the geopolitical rights and wrongs shouldn't be what this case ends up being about because both sides can -- can make presentations about that, and I think that's not a relevant factor for the Court to -- to detain, certainly not to detain someone who's facing a criminal -- a criminal case in this court.

And the idea that Zainab is a threat to safety of the community, of children that can't be mitigated with any conditions, that's just not borne out by her entire life history. The period of months of the conduct in the indictment should not outweigh what has otherwise been, both before and perhaps most importantly after, a life of law-abiding behavior and community engagement in a positive way.

When I look at what she's done in her resumé, when I hear from community members, it's not like -- there's not some revolution happening here in the courtroom. People are sitting and listening quietly to the proceedings, to what the government has presented, and despite the things that -- that were said to the Court, and I think that they're here because there is some community that cares for each other and there's community that is not just about hate.

And so for all of those reasons, Your Honor, Ms. Hakim is not a risk to the community that cannot be mitigated by conditions. She is not a serious risk of flight. We ask the Court to consider the Bail Reform Act factors, to consider that Pretrial Services assesses Ms. Hakim to be manageable on pretrial release. I believe they recommend a condition of GPS location monitoring, which I know Ms. Hakim will have no problem complying with. And whatever other conditions the Court deems necessary, we ask for her to be granted bond while this case is pending. Thank you.

THE COURT: Thank you.

Brief rebuttal as to Ms. Hakim?

MS. SMITH: Yes. Thank you.

THE COURT: Oh, wait, Mr. Hall's not here.

MS. SMITH: You want me to wait?

THE COURT: Yeah.

MS. SMITH: But I do -- I --

THE COURT: And there he comes.

(Mr. Hall enters the courtroom at 3:13 p.m.)

MS. SMITH: Oh. You ready?

MR. HALL: Thank you, Judge.

MS. SMITH: I thank you for allowing -- allowing me to do the brief rebuttal immediately after, and I will be brief.

I -- there are a couple things that I -- I heard, and I -- and I want to be clear, I never -- I never want and never will during the pendency of this case debate who's on the right side of the Israeli-Palestinian conflict. It gives context for the Court to understand what those symbols mean when Hamas uses them, and I have not and -- and I -- and what I'm proffering to the Court is that the -- the mindset of being antipolice, it is coming from this Hamas loyalty, that they do not believe that they're doing anything wrong.

Now, I recognize that this is a very smart individual who graduated with a high GPA, and there are many, many

criminal defendants who come before the Court that don't. And I would suggest to the Court that not only does that make it easier in some ways for her to commit these acts, but also, in fairness to everyone that comes before you, I'm not sure their intelligence ought to be a deciding factor. She's been given an opportunity to go to the University of Michigan. Not everybody gets that opportunity.

I can proffer that I just received the information that she was fired from the University of Michigan, not because of protest activity, but she was cited when she refused to comply with commands during a protest. The police commanded her, she ignored them and physically pushed back at -- at the police. She was terminated for multiple violations of -- and if you can excuse my phone use -- of the University Community -- Violence in the University Community, in violation of SPG 601.18.

THE COURT: Okay. I know that -- I know that danger is -- is relevant to Factor 4 that I have to look at under the Bail Reform Act, but I've got your -- your sheet, your worksheet for the hearing and I heard what you said, and you're not moving on the basis of danger for -- for detention. You're moving on the basis of risk of nonappearance or flight risk and you're moving on the basis of obstruction of justice, correct?

MS. SMITH: Well, yes to both because the eligibility falls under serious risk of -- of flight and serious risk --

risk of witness intimidation, but then when you qualify for a detention hearing, those 3142(g) factors come into play.

THE COURT: Right. As I said, the fourth factor is -- the fourth factor is always -- regardless of what the grounds of eligibility were, it's always danger.

MS. SMITH: Right, yes.

THE COURT: But the basis of your moving is on the basis of the -- the F-2 factors, correct?

MS. SMITH: Maybe we're saying the same thing. I believe that these defendants present a danger to the community as well. I just can't get a hearing on the basis of that. So it is a factor and I think it's a factor the Court should consider, and we are seeking their detention in part because we believe they are a danger to the community.

THE COURT: No, I understand, and I will take that factor into consideration 'cuz I understand the factors very well. But what I'm saying is what you're trying to prove is that no condition or combination of conditions by a preponderance of the evidence can reasonably assure their appearance in court or her appearance in court and can reasonably assure that she won't obstruct justice. You're not trying to prove by clear and convincing evidence that no condition or combination of conditions can reasonably assure the safety of the community, are you?

MS. SMITH: I think that we have shown that, yes.

The Court may take a different view of that, but I think that when you look at this case as a whole, I think that these defendants do show a clear -- by clear and convincing evidence that they're a danger to the community.

THE COURT: Well, they may be a danger to the community, but the question is have you shown by clear and convincing evidence, 'cuz that's the standard for that, that no condition or combination of conditions could reasonably assure safety of the community or of any individual, right?

MS. SMITH: Correct.

THE COURT: So I -- but it seems to me that -- I'm just trying to understand what you're saying you've -- in closing what you're saying you're -- you've shown me.

MS. SMITH: We have shown that they are a serious risk of flight, that she -- she in particular is a risk of flight. She's got a flight scheduled to go out tomorrow morning. Now, I -- I want to be clear that I'm not withholding any information that we've received from the State Department. All I have in their records is tomorrow morning's flight. She may have flights beyond Montreal. I do not see in those records -- you got the complete record. We do not have a hit that she has a return flight.

Now, that doesn't really matter for -- for risk of flight. I would -- I would say that if this Court is even considering releasing her on bond, it should be under the

condition that her driver's license and passport are turned in before she's even released from this building because there's a high incentive to leave the country, particularly when her boyfriend, who is an unindicted coconspirator in this case and may certainly be facing criminal charges down the road, have tickets to get out of the country as early as tomorrow morning at 10:15.

THE COURT: When were these booked, can we tell?

MS. SMITH: They were booked about a month ago from what I understand, and that's what I have initially proffered as well.

THE COURT: Okay. And when was the search carried out at her home?

MS. SMITH: April of 2025.

THE COURT: Did she leave the country after April of 2025?

MS. SMITH: I think that she would probably say that she did.

THE COURT: And did she come back?

MS. SMITH: Let's assume --

THE COURT: I assume so, right?

MS. SMITH: -- for the sake of argument that she did.

THE COURT: She did?

MS. SMITH: Sure.

THE COURT: Okay. So I mean that's obvious --

MS. SMITH: Yeah.

THE COURT: -- is the answer for that.

MS. SMITH: But she didn't have any federal charges hanging over her head either.

THE COURT: Okay. So -- but what I'm trying to understand is when she booked this about a month ago, was there anything particularly going on in this case that would lead you to believe that she did that in an effort to flee as opposed to in an effort to -- 'cuz she has a long international history of travel.

MS. SMITH: Correct. No, I don't think so.

THE COURT: So -- so do a lot of people. So do I.

MS. SMITH: I'm not suggesting that she had wind that this was coming. What I'm suggesting to the Court is that the -- the -- you know, now that she's got an opportunity to get out of here, maybe these two are thinking about it a little bit differently than they were before. She's got a number of felony charges that are hanging over her and her sister and potentially her boyfriend. And all of these defendants except for Mr. Weger have extensive international travel experience and ties to other countries, and so that makes her a flight risk as well.

I do want to make two more brief points. One is that it is not correct that -- that dad's work laptop has been searched and found to have no contraband. Mom and dad refused

to give passwords for those devices, and they were told, "If you give us the password and we can check it for contraband, we'll give it back to you," and they refused to do so.

And the last thing I want to say about this rhetoric and that that just keeps coming up over and over again, none of this comes out of the mouth of the United States. These are all things that these defendants have said. I'm not injecting anything. I am relaying to the Court what came out of their mouths and in their devices, and I want to be clear about that.

And so for all these reasons, Ms. Zainab Hakim should be detained pending trial.

THE COURT: All right. Thank you.

(Brief pause)

All right. Ms. Bashi, I'll address your client.

MS. BASHI: Thank you, Your Honor.

THE COURT: Ms. Hakim, I -- I have to apply the Bail Reform Act, which is the federal statute set forth at 18 USC Section 3142. That provides me with factors that I have to consider in terms of whether you should be released and what the conditions should be and whether you should be detained.

I'll start out by saying that this is not a presumption case, so the presumption is that you should, in fact, be released. And as the United States Supreme Court said in *United States vs. Salerno*, 481 U.S. 739 at 747, 1986, "The [Bail Reform] Act carefully limits the circumstances under

which detention may be sought for the most serious of crimes."

And then it goes on, to begin at page 755 -- really -- it's really not beginning but it's the end of Chief Justice Renquist's opinion. He notes that "in our society, liberty is the norm, and detention prior to trial and without trial is the carefully limited exception."

Now, the factors that I have to consider first are the nature and circumstances of the offense charged. The offenses charged in this case against you are very serious. You are charged not only with a conspiracy -- and let me -- one moment.

(Brief pause)

You're charged not only with multiple counts of conspiracy to commit threats in interstate and foreign commerce, but you are also charged and probable cause has been found to believe that you committed the offense of witness intimidation.

I'm going to start out by saying a few things that probably apply across the board to all you and your codefendants. I've heard some and read some incredibly difficult things to read. I have read distasteful statements and I read about distasteful actions. I have read about an ill-conceived notion of what the First Amendment entitles people to. It entitles people to have their thoughts. It entitles people to say things and express things that may be

distasteful to others. It -- quite frankly, most importantly, it really protects the minority view, a view that may be one that's not held by others or not held by the majority of others.

The other thing I find -- but it does not protect acts that harm other people or cause them to be in fear about staying in their own homes.

I'm also disturbed because as a university graduate my -- University of Michigan graduate myself, I'd like to believe that University of Michigan graduates like myself understand the need for civil discourse in this country. I'd like to believe that we can strongly disagree with each other without putting people in fear because things are being thrown through the windows of their homes or because spray paint has been applied to their homes with things that attack them that make people afraid to go home or to go to sleep. I'd like to believe that in this country we know how to disagree, we know how to logically support our points and to win our points by convincing others that we are right without stooping to the kinds of things that I've heard about and have been encountered here.

And I'll also say this because we had a witness or rather victim statement from the Jewish Federation. It saddens my heart and I find it completely distasteful to hear this type of antisemitic communication and to know that Jews, who have

suffered so much persecution, including having 6 million of their fellow Jews slaughtered in -- during World War II, in this day and age in this country should have to deal with that, should have to find that their own Federation is defaced and feel that they're under attack in a place where they should be safe.

I say that as a backdrop to everything else I'm going to say. I am not immune to all of this. I grew up in a Jewish neighborhood. I have Jewish friends, I have Muslim friends. I've been around the world to most of the countries you've been to. And I would hope that that kind of education and that kind of experience of traveling around the world would open one's mind to the fact that we're all co-inhabitants of this planet and we have to find a way to be able to even disagree with each other without making people feel so threatened, by using words to debate our points. And I'm not going to solve these -- these -- the conflict that's going on in the Middle East right now; I don't have to. That's a backdrop as your attorney said. So I just want -- want it known that I'm not immune to all of this.

The first factor that I have to look at, as I say, is the -- the -- the nature and circumstances of the offense charged, and the nature of the offense charged is very serious.

I also, you know, look at what is your role in this, and it's alleged that you are a leader and an encourager, that

some people have called you the mafia boss.

But I also look at what it isn't. And although there's hints and rhetoric that try to relate this to terrorism, you're not charged with terrorism, so I recognize what you're not charged with.

I also recognize, as your attorney stated, that there were no injuries, that there were no weapons involved, even though there were weapons talked about. But I also recognize that homes were breached and devices were thrown in the homes that turned out not to be explosive or harmful in the sense of being able to take someone's life or maim someone, but -- but rather were stink bombs as we say. It's terrorizing if that happens to you, but it's not been charged as terrorism.

And so I recognize what the case is and I recognize what it isn't. And, in fact, there's no presumption here based on these charges that you should be detained. The presumption goes the other way.

So I find that that first factor for you is a mixed factor. The nature is very serious, the circumstances are serious, but I also recognize what isn't happen -- what didn't happen. The efforts were very coordinated.

I also recognize, and this pains me as well, the hatred towards our government that's been expressed, a government that I serve very proudly and a government that I sacrificed my life for in many ways in this job, and as do many

of the attorneys and other officials in this courtroom.

But in the United States you're entitled to hate your government. As -- as difficult as this is to say, you don't -- you're not forced to salute the government or love the government. You're even allowed to have feelings that the government should be replaced, and that's not true everywhere. In some countries if you express those kind of ideas, you'd be thrown away for life, many executed. Here we do have freedom of speech, and sometimes the speech that is spoken is extremely troubling, and it is extremely troubling what I've heard.

But I find that the first factor is a mixed factor for you, largely going against you, but again, I recognize what hasn't happened here.

The second factor is the weight of the evidence, and it's the weight of the evidence that -- not that you did or didn't commit the crime, crimes charged. It's the weight of the evidence as to risk of nonappearance and the weight of the evidence as to danger.

I'll start with risk of nonappearance. There is some evidence that you pose a risk of nonappearance. You have had extensive international travel over , you know, a relatively short period of time, as to varied places I might add — France, Spain, Costa Rica, United Kingdom, Malaysia, Mexico for tourism, and Saudi Arabia for religious reasons, and I respect that. Many of my Muslim friends have gone to Saudi Arabia for

religious reasons, and many of my, you know, Catholic friends have gone to Rome for religious reasons, and I -- I -- I -- I think that's to be honored. And tourism is perfectly acceptable. And apparently you have left the country and come back since the time that your house was searched, which means that you knew you were under investigation and didn't flee, and I take that into consideration.

You also have tickets to leave as recently as -- as soon as tomorrow from this country. Your attorney has indicated, and I accept her proffer, that although it's a one-way ticket to Canada, that was in order to depart from Canada. And I happen to know as a fact that you can get remarkably cheaper trips out of Canada than you can out of the United States — in fact, you can cut your airfare in half sometimes by departing from Canada — so I'm not surprised by that. And your attorney has proffered that you had a return ticket, and -- and that would be consistent with what you already did when you already knew that you were under federal investigation.

The other thing is the government has not shown me that any of this travel is anything other than travel. They've not shown me that you have ties to terrorist organizations overseas or to people who are planning to, you know, induce you to break the laws of the country or anything like that, and I'm sure if they had evidence of that, they would have told me.

They also haven't showed me that you have any assets overseas, anything that would allow you to remain overseas or property or -- or anything else.

So apparently you have extended family overseas, but a lot of people have extended family oversees, including me. And a lot of people have traveled internationally, including me as recently as two weeks ago. So -- but I take that into consideration.

And then we look at danger, and one of the things that's striking to the Court, and it was striking apparently to the magistrate judge who ruled in one of these -- on these bond decisions elsewhere, is that I see nothing recent, nothing that's, you know, less than a year old in this case. The government says, "Well, you know, we -- we seized the devices and therefore we can't know what's going on." But I think if the government had evidence that anything has happened since this all kind of got out of hand, they would have told me. And so I look at what's your behavior been during that time.

And so I think that there are some things that go against you in the second factor, but they are factors that could be mitigated through bond conditions.

The third factor is largely in your favor. You are -- I mean there's no magic to having a college degree. It's not like you have a college degree, you get out. Okay. But it is unusual for me to see someone with your level of

achievement standing in front of me where you are.

You are -- you were born in Michigan. You've lived in the Eastern District of Michigan for a long time.

And I already talked about your travel history.

You, for a young person, have had a work history. You were apparently fired by University of Michigan, but in light of these charges, that's not exactly shocking to the Court.

Your mental health history looks good. Your general health history looks good.

Your use of drugs seems to be minimal that we can tell.

And your criminal history is nonexistent except for this case, which is another unusual thing in this court.

Pretrial Services recommends bond. I consider that. I don't have to follow that recommendation but that's what they recommend.

I'll say some other things specific to you. Your resumé is impressive and it's been submitted to me.

You have a letter from your employer which is very favorable to you and also demonstrates an intent for you to come back if you were to have left tomorrow.

I specifically asked the government in their rebuttal whether there's any suggestion that you knew this was coming when you booked the ticket and the answer was no.

You had a 4.0 from the University of Michigan. You're a National Merit Scholar.

You have strong family support. Apparently they're here.

When law enforcement came to you, your proffer by your attorney showed that you were cooperative with law enforcement, which is important to me in terms of the question of obstruction of justice and being able to follow the bond conditions.

And then we have a 13-month period where we -- you know, the government doesn't -- able to tell me anything that you did. What it looks like you did is you got very, very fired up over the conflict in the Middle East, completely out of hand, quite frankly, and then took it to extremes that really hurt property. Most of the -- most of the crime attributed is vandalism, and as I say, the homes were breached in some cases, but what they were breached with was stink bombs. Horrible, it's horrible, and would be very terrifying, as I say, to the people who live there. Nobody should have the -- have their home breached. But then it seemed to have mushroomed, then died down, and then we have no more after that. And so that's where I -- that's where -- how I see it.

Pretrial recommends that you should receive bond. So the third factor I should say goes in your favor.

I've got to look at the fourth factor, which is

danger to the community which would be posed by your release. There -- there is some risk of danger. If you continue down this path, this sort of radical path, you could find yourself posing harm to others. But there's no evidence that you -- you had weapons, no evidence that you actually harmed anyone in any physical way, and, in fact, it's spotty as to what you actually did other than encouraging others and being the mastermind behind this. Very bad ideas. Bad is not a big enough word. But I think that conditions can be imposed to reasonably mitigate the risk of danger.

There is also an allegation, of course, of witness intimidation, and I believe that there's a condition of no contact with zero tolerance that can be imposed for that.

So I am going to order that you be released on a $10,000 unsecured bond with the following conditions. It's -- you're not paying money today. You'd owe the government $10,000 if you violate your bond conditions. I'll also tell you if you violate your bond conditions, you could be separately charged with an additional crime under federal law of violating bond conditions. On top of that, your bond could be revoked and you'd be placed in custody until trial. On top of that, your -- your behavior on bond would be considered if you -- by the sentencing judge if you were to plead guilty or be found guilty.

Your conditions are as follows:

You're to report as directed to Pretrial Service Agency.

Second, you're to surrender your passport, enhanced identification or any -- any international travel documents.

You're not to have any and you're not to apply for any, which is your third condition.

Fourth, I'm going to -- I'm -- whoever's the Pretrial Services officer on this, I'm going to make this more restrictive. In number four the travel's going to be restricted to the Eastern District of Michigan. You're going to have to ask your attorney where the Eastern District of Michigan's borders are because much of Michigan's in the Western District, including the entire Upper Peninsula. Lansing is in the Western District, Kalamazoo, Battle Creek, lot of places not very far from here. If you're out of the Eastern District of Michigan, you're in bond violation. Obviously you cannot leave the state.

You are to avoid all contact, directly or indirectly, with codefendants, including Amatullah Hakim, and any person who is or may become a victim, and that will specifically be the person that you're alleged -- include the person that you are alleged to have intimidated as a witness or interfered with as a witness. It will be zero tolerance for that.

So any -- when I say direct or indirect, I mean you can't be communicating through social media, you can't be

communicating through other people, you obviously can't communicate face to face, no texting. I mean no contact. And it is zero tolerance as to victims. I mean it's a bond violation whether you contact any of them, but if I find out you've contacted a potential victim, your bond is revoked.

(Computer notification alert sound in court)

I don't know why that keeps doing that when I keep silencing it.

You're not to use or lawfully -- or excuse me, not to use or unlawfully possess a narcotic drug or other controlled substance unless prescribed by a licensed practitioner. Marijuana is illegal under federal law, so that includes marijuana. Even if it is prescribed by a licensed practitioner, it would be considered a bond violation.

Seventh, you're to submit to any testing for a prohibited substance if required by the Pretrial Service officer.

Eight, you're to participate in a program of inpatient or outpatient substance abuse treatment if directed by a Pretrial Service officer.

Ninth, I'm going to make a change to number nine. You are to participate in location monitoring and comply with the program requirements. Pretrial Services recommended standalone monitoring with global positioning. I am going to make that home detention with a GPS technology.

I'm going to explain what home detention means. It's not the strictest possible condition but it's close. Home detention means you are restricted to your residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances and court-ordered obligations. That way we make sure you're able to continue to work and continue your education, which are important to you and important to the Court, but I don't want you out and about because that -- I want to prevent communication and getting together with codefendants and anything that puts you out on the street that would, you know, potentially be repeating the activities that are indicted here.

You got that, Pretrial?

MS. HARLA: Rebecca Harla on behalf of Pretrial Services.

Yes. I did want to ask for one clarification.

THE COURT: Sure.

MS. HARLA: The Pretrial Services Report had recommended in the no contact condition that you had referenced "avoid all contact, directly or indirectly, with codefendants," excluding...

THE COURT: I'm sorry, excluding, yes, because that is her --

MS. HARLA: Sister.

THE COURT: -- sister, right, the excluding.

MS. HARLA: Okay. Thank you.

THE COURT: I'm not going to prevent you from being in contact with your own sister, but it's zero tolerance as to any contact with a victim.

Have you heard all those? Sorry.

DEFENDANT HAKIM: Oh, yes.

THE COURT: Do you understand each and every one of them?

DEFENDANT HAKIM: Yes.

THE COURT: Can you tell me that you will abide by each and every one of them?

MS. BASHI: Your Honor, can I have one moment?

THE COURT: Yes.

(Brief pause)

MS. BASHI: Your Honor, we're just clarifying. I believe the Court's order was clear. Ms. Hakim is to surrender her passport and any enhanced driver's license?

THE COURT: That's correct.

MS. BASHI: She doesn't have one, and I believe Pretrial confirmed that with the Secretary of State, and so she just wanted to make sure she could still drive to and from work.

THE COURT: I -- I don't think you can leave this country with just a driver's license, can you?

MS. BASHI: No.

THE COURT: So that's kind of the key.

MS. BASHI: Thank you.

THE COURT: Yep. And obviously you do need a car in most of this country to get anywhere.

MS. BASHI: Yes.

THE COURT: Okay. So can you tell me you'll abide by all those?

DEFENDANT HAKIM: Yes, I will abide by all of them.

THE COURT: All right. I don't want to see you here again. It would be really bad if I did. I guess I probably maybe wouldn't because this is indicted and you'd be having a chat with the district judge.

But what I really want is for you to, you know, comply fully and be able to lead your life peacefully while you're presumed innocent at this time, and that's another thing the Court acknowledges. As serious as this case is and as much argument as there is in this case, you're presumed innocent. That's one of the other rights that we respect in the United States: even if people hate the government, that they have the right to be presumed innocent.

And I also recognize that this is not a trial, that I'm not finding -- making a finding of guilt. I also recognize that this is not a sentencing. This is a question that the Court has to ask as to whether conditions can reasonably be

fashioned to -- for the safety of the community and to -- so that you will not -- you will appear in court, and I believe that -- that there are, and those are the conditions that I'm imposing.

MS. SMITH: Your Honor, may I ask for clarification about when that passport must be surrendered? I requested that she not be able to leave the courthouse until that is done. I know her family is here, and since they offered to go and get flight itinerary, perhaps they can bring it back to the courthouse before the close of business. The reason I'm asking that is because of the flight risk.

THE COURT: Yeah, I -- I understand. Ms. Bashi, I -- I do share -- I mean that is a concern because she has this flight for tomorrow so we need to really assure that she can't get out.

MS. BASHI: I understand, Your Honor. The problem is that it's 4:00 o'clock. I'm not sure how to accomplish that before the close of business.

THE COURT: Pretrial comes to the rescue maybe.

MS. HARLA: When I had spoken with the defendant's mother yesterday, I had asked that she bring the passport to the Court so --

THE COURT: And has she?

MS. HARLA: -- it would be here.

MR. WEISS: I apologize, Your Honor, if I may tender

this to counsel.

THE COURT: Okay.

MS. SMITH: All right. That solves the problem.

THE COURT: Is that -- open it up, make sure it's the right passport.

MS. BASHI: Two minutes before 4:00 o'clock.

MR. WEISS: Just trying to be helpful, Your Honor.

THE COURT: Okay. Thank you. Apparently all counsel have each other's passports.

(Brief pause)

Okay. All right. The passport is -- the record will reflect the passport has been turned in.

MS. BASHI: Thank you.

THE COURT: When you sign the necessary papers, the necessary bond, I'll sign the necessary papers for your release.

And while you do that, I'm going to take a very brief break. I'll be right back.

(Court in recess at 3:57 p.m.)

(Proceedings resumed at 4:02 p.m., all parties present)

THE CASE MANAGER: The Court recalls Case 26-20306, Colin Weger.

MS. SMITH: Maggie Smith appearing on behalf of the United States.

MR. JONES: Jonathan Jones on behalf of Defendant Mr. Weger, Your Honor.

THE COURT: Okay. And you're Colin Weger?

DEFENDANT WEGER: Yes, Your Honor.

THE COURT: Okay. Just -- I know you are, but I just want to make sure it's on the record.

All right, Ms. Smith, you may proceed when you're ready.

MS. SMITH: I -- I think it's his turn. I already proceeded on each of the defendants.

THE COURT: Oh, okay. All right. So you've said everything that you want to say about Mr. Weger?

MR. JONES: The notes I took indicated you spoke to these issues, yes, Counsel?

MS. SMITH: Yes, I believe -- didn't I? I think I spoke to all of them, and now --

THE COURT: Okay.

MS. SMITH: -- I think you're giving the defense an opportunity one by one.

THE COURT: Fair enough, yep.

MR. JONES: All right. Your Honor, I'm going to try and make this as efficient as I -- I can for you because some of the issues and arguments I think are duplicative, so I'm going to try and be more efficient.

My client stands before you with absolutely no

criminal history, tremendous ties to the community. I want you to know, I'm not going to name them, but his employers are here today to support him and willing to take him back to work literally as soon as he can return. When I asked when he was scheduled again, they said "as soon as we can have him, he works every day."

He has ties to the community. He lives within the district as I said. There's absolutely nothing on the record to suggest my client is a flight risk. Specifically, he doesn't have any scheduled travel or a history of leaving the country. The Pretrial Services Report very succinctly discusses that he made a trip several years ago and had goals of taking another one but cancelled it. I would fully expect any release to include the surrender of his passport, which we would obviously do as quickly as we could get it to the marshals or Pretrial.

The -- the notes I made are significant. The -- the indictment has ten counts. My client is named in two. My client's counts are serious, and no way do I mean to trivialize them, but having said that, a lot of the issues that were discussed and concerns do not enure to him. He was not involved in any injury.

There is discussion about him having a gun. While the Court knows he hasn't been charged with that because the possession is legal, it would certainly be surrendered, and

there is no reason to believe that he would not comply with any order.

I'd also like to state that he did take a drug test. He was negative. And again, as you pointed out, marijuana is illegal as far as federal laws are concerned and he would not be able to continue to use that.

There has been substantial amount of time since the documented activity that he's alleged to have committed and now, and he has not done anything to demonstrate any furtherance or any of this.

I think the pretrial recommendation is absolutely applicable, and I would ask you to adopt it for the reasons stated.

(Sneezing in the courtroom)

Bless you.

THE COURT: Okay. All right. Ms. Smith?

MS. SMITH: Thank you, Your Honor.

I made the general argument. The same applies to this defendant. The only difference that I see here is the -- the -- the concern about the firearm and the silencer. And while he has a Second Amendment right, or did, to possess firearms, he -- he's under federal indictment now and we don't know where that gun and silencer are. And so if his employers are here and if there's some way, I would urge the Court to condition his release on a lawful transfer of that firearm or

somebody that can say under oath that they have taken possession of it or have it at this point in time.

THE COURT: Is there any such person?

MR. JONES: We would surrender it to whatever matter was dictated to us to make that transfer.

THE COURT: Why don't you come closer to the microphone. You're kind of far away.

MR. JONES: No one's ever told me to project before, Judge. I said --

THE COURT: It usually goes with the job description to project.

MR. JONES: I think it's more being an obnoxious Boston guy.

THE COURT: Okay.

MR. JONES: But having said that, you tell us where to surrender to and that's what we'll do. That -- that part's not -- a nonissue.

THE COURT: Well, who has possession of it now?

MR. JONES: His parents who do not live with him. Well, they may -- they're on the border of the district. But as I said, we can turn it in to law enforcement upon command.

I do want the record to reflect, I'm not going to read an address into the record, but he and his parents do not live in the same community or county.

THE COURT: Okay. Are they here?

MR. JONES: No, they are not. They're intricately involved but not here. And for whatever it's worth, that was my instruction.

THE COURT: Are his tactical gear, scopes and lasers in the possession of the government, Ms. Smith?

MS. SMITH: No, we found none of that at the house that he's been residing at. He's there with other, for lack of a better term, like-minded individuals in a -- in a -- in a home that bedrooms are rented out.

MR. JONES: Any and all of the said listed items that concern sister counsel will be surrendered.

THE COURT: Does Pretrial want to speak to this in terms of how we can achieve that?

MR. ROBERTS: Afternoon, Your Honor. Daniel Roberts with Pretrial Services.

We could have his -- depending on how you release him, if he is going on a tether or not, we will be out to do a home visit within the next 48 hours or 24 hours. We can collect his passport at that point in time.

As for the firearms, we would give him 48 hours to have them removed from the residence and giving him instructions and paperwork on where they --

THE COURT: Well, apparently they're not in the residence. They're with his parents right now. They're not -- they're not even in this --

MR. JONES: Right, but I don't want the Court to draw the inference they're not easily attainable. The timeframe that Pretrial just discussed with us is completely achievable and we will comply.

THE COURT: Okay. Government have anything further to say on that?

MS. SMITH: Not on that, Your Honor.

THE COURT: Okay. Government have anything further to say?

MS. SMITH: No, we rely on the prior argument I made.

THE COURT: Okay. Thank you.

MR. JONES: Your Honor, if I may, just to add, he informed he does plan to continue his education in the fall, locally of course.

THE COURT: He's at Washtenaw Community College, is that right?

MR. JONES: Correct, Your Honor.

THE COURT: Okay. Mr. Weger, I am going to release you on bond. Under the first factor, you're actually charged with less than your codefendant Ms. Hakim was charged with. You're under -- under two counts I believe of a conspiracy to transmit threats in interstate commerce. Let me just find your... verify that.

MR. JONES: It's 3 and 4 I believe.

THE COURT: Right. And what I've heard today is that

you have an -- extremely violent views that are hateful towards people who don't share your -- your religion or ethnicity or whatever it is, and that you purchased the AK-47 and tactical gear. That -- that would have to be required to be turned in.

But what I see in terms of your -- your role here, the government emphasized that you talked about destroying certain construction equipment from CAT, C-A-T, Caterpillar, and that you're eager to start research on that.

The biggest concern for the Court is your purchase of -- of the gun and the silencer, and that was done in 2024, but again, we don't have any information about you doing anything since.

Yes, the combination of that with you getting $400 worth of patches that are pro -- pro-terrorist organization is of concern, a lot of concern, and the tactical gear as well, the tactical gear, but none of that's been found but apparently we know where it is and could be turned in.

I think I'm concerned that you've -- you've listened to an awful lot, and at your young age of 24, you have been influenced in a way that is very unhealthy and destructive, not just to your citizenship but to this count -- to -- to yourself.

And of course you did have a right to -- Second Amendment right to purchase the gun when you did. The government hasn't presented me with any evidence that you

talked about using it against anyone, and you didn't, in fact, use it against anyone. You went to the target range, but that's what people with guns do, they go to target ranges, so there's nothing, in and of itself, about that that is of concern.

And Pretrial Services recommends your release on bond.

You have been employed in several jobs.

You have a high school diploma. You're continuing your education at Washtenaw Community College. I recommend that you take a really good course on American government, which I used to teach there. Maybe you'll learn something about this country that you didn't know and maybe you'll learn to love it. But you're allowed to not like this country. And -- and interestingly enough, it's this country that's protecting your rights. It's the very government that you apparently don't like very much that's sitting before you trying to protect your rights and uphold a Constitution that you might want to tear up, but that's what I'm sworn to do.

So I think there are conditions that could reasonably assure the safety of the community and can reasonably assure your appearance. There's no suggestion that you wouldn't appear. You have no prior criminal history, although this is a pretty bad way to start.

You are presumed innocent, but you're in federal

court. You're obviously under observation by the federal government, and if you haven't figured that out yet, then I can't -- I can't help that lack of observation. But if you step out of line, it'll be discovered, I can just guarantee you.

You're not -- you're not someone who has traveled so that's good.

You have ties to this community. That's good.

And, you know, the -- the biggest concern is going to be turned in and you'll not be able to purchase or receive or possess any other firearms.

So the Court will release you on a $10,000 unsecured bond. Have you read your bond conditions as -- that are in the pretrial report?

MR. JONES: I showed them to him. I'm sure he doesn't have it memorized but I'm holding it as we speak.

THE COURT: Well, I'll tell you it's a $10,000 unsecured bond. You're not putting up any money today, but you'd owe the government $10,000 if you violate your bond conditions. That will be the least of your problems 'cuz if you violate your bond conditions, the Court can revoke the bond and then you'd just be placed in jail till trial. And I don't think it's been pleasant where you've been so far. This would be a much longer term. So you have to carefully follow your bond conditions. On top of that, you could be separately

charged with a federal crime of violating your bond conditions. And on top of that, if you were to plead guilty or be found guilty and you performed poorly on bond, that would be considered by the sentencing judge.

So your bond conditions are as follows. Listen very carefully.

You must report as directed to Pretrial Services.

You must surrender any passport, enhanced identification or other international travel documents immediately to the supervising officer as directed.

You're not to obtain a passport, enhanced identification or other international travel documents.

You are to abide by the following travel restrictions. I'm going to make that more narrow than Pretrial Services has recommended. Does Service -- Pretrial Service officer hearing me on this?

MR. ROBERTS: Yes.

THE COURT: Okay. He's going to be restricted to the Eastern District of Michigan. You need to know where the boundaries are, sir. Ask your attorney, he'll show you a map. Ask your Pretrial Service officer, they'll be happy to tell you. But if you wander off out of this state or you wander off to Lansing or the Upper Peninsula or a whole bunch of places that are in the Western District of Michigan, you will be out of compliance.

You are to avoid all contact, directly or indirectly, with codefendants and any person who is or may become a victim, with a list to be provided by the U.S. Attorney. If you have any contact with a victim, I'm considering that zero tolerance, I will revoke the bond, or Judge Levy will. When I say contact, direct or indirect, I mean exactly that, I mean no contact. You know, everything I've heard today suggests that you all have thought that you're really pretty clever about being able to communicate and the government not being able to find out about it, but I don't think you're as clever as the government is, quite frankly, but you can test that if you want and that'll put you in jail. No contact at all — no texting, no social media contact, no messages sent through other people.

Six, you're not to use or unlawfully possess a narcotic drug or other controlled substances unless prescribed by a licensed practitioner. There is some evidence I believe in your case -- maybe that was with Mr. -- maybe it wasn't.

MS. SMITH: No, this was this defendant, Your Honor.

THE COURT: It was, yes.

MS. SMITH: Yes.

THE COURT: There was some evidence of drugs found, either known to be drugs or what looked like drug paraphernalia, in your residence, and I just want to be clear that will be a bond violation if you continue drug use, and that includes marijuana. Notwithstanding that it may be legal

in the state of Michigan, we're in federal court under federal law, and even if it's prescribed by a licensed physician, I'll find you, or whoever's reviewing it will find you, in bond violation for use of marijuana, so stay away from it.

Seventh, you're to submit any testing of a -- for a prohibited substance if required by Pretrial Services or supervising officer. Testing may be used with random frequency, and I'm not going to go through the rest of all of that. But you may not try to obstruct or attempt to obstruct or tamper with the efficiency and accuracy of the substance abuse screening.

Eight, you're to participate in location monitoring, and they are recommending standalone monitoring. When does your client need to be out of the house for education and for -- and for employment?

MR. JONES: Well, I can't answer the education question 'cuz he wouldn't have enrolled, that will be in the fall, but I can ask about what's your normal work hour?

DEFENDANT WEGER: 9:00 a.m. to 6:00.

MR. JONES: So he normally works 9:00 to 6:00 or 7:00, so if you could potentially make it in an 8:00 to 8:00 window either way, and obviously he can't do school and/or work in the evening, that would -- I'm sure that would work.

THE COURT: Does he intend to go to school in the evening 'cuz a lot of Washtenaw classes are in the evening. I

used to teach there in the evening.

MR. JONES: Apparently he did.

THE COURT: Okay. So what I'm going to do is impose a curfew of 8:00 a.m. to 8:00 p.m. for now, and I'm going to give discretion to Pretrial Services to adjust it based upon his educational schedule, which he will have to turn in to them so that if he's taking at classes at night, they can make an adjustment to the curfew accordingly.

MR. JONES: That would be great, Judge. Thank you.

THE COURT: You'll be on a GPS tether and you'll have to comply with all the program requirements, pay costs of the program based on your ability to pay.

Did you hear each and every one of those conditions?

DEFENDANT WEGER: Yes, Your Honor.

THE COURT: Did you understand them all?

DEFENDANT WEGER: Yes.

THE COURT: Will you comply with all of them?

DEFENDANT WEGER: Yes.

THE COURT: Are you sure?

DEFENDANT WEGER: I am absolutely sure, yes.

THE COURT: You're going to obey this government when it tells you to comply with those conditions?

DEFENDANT WEGER: Yes, Your Honor.

THE COURT: Okay. Then I'm going to sign the papers for your release when you sign the bond conditions, until we

clarify whatever Pretrial wants to tell me.

MR. ROBERTS: Excuse me, Your Honor. It was an oversight on the conditions. I believe that it wasn't checked for no possession of firearms or destructive device.

THE COURT: No, that's -- yeah, that's pretty important in this one.

MR. ROBERTS: We would recommend that.

THE COURT: Yes, we're going to add that. No firearms or destructive devices or dangerous devices.

MR. JONES: Expected, noted, complied.

THE COURT: And the firearms will be turned in you said within 48 hours?

MS. SMITH: Yes.

THE COURT: And I want him to find a way other than him turning them in. Get his family to turn them in. I don't really want -- I don't want him touching them.

MR. JONES: I was going to discuss that with Pretrial.

THE COURT: Yeah.

MR. JONES: But I think that's how we'll do it anyway.

THE COURT: Yeah.

MR. JONES: Okay.

THE COURT: And I -- I want to see something else.

(Brief pause)

You have testing. Do you have treatment for -- for drugs?

MR. ROBERTS: Your Honor, we did not recommend treatment. His last use of marijuana was in December. We do not believe treatment is a necessity at this time. However, because of his use of marijuana, we want to be able to test him, and if treatment is necessary at a later time, we can always request that as well.

THE COURT: Well, I'm going to -- I'm going to authorize treatment if he tests positive.

MR. ROBERTS: Okay.

THE COURT: So you don't have to come back to me on that, okay?

MR. ROBERTS: I also want to clarify about the turning in those firearms.

THE COURT: Mm-hmm.

MR. ROBERTS: Who is he turning these firearms in to?

THE COURT: Ms. Smith?

MS. SMITH: That's a good question.

THE COURT: It's a great question.

MS. SMITH: Usually they are transferred to another owner who is not associated with residences that he's going to be visiting or staying at.

MR. ROBERTS: Okay. That -- that's fine with us, and as -- we would just say that they would be removed, we'd have

paperwork showing who he turned them over to, like in custody. I just wanted to make sure it wasn't like you were expecting Pretrial Services to collect those firearms.

THE COURT: You aren't looking for an AK-47, tactical gear?

MS. SMITH: I would request that proof of the transfer in writing by the person that accepts the firearm.

THE COURT: Yes.

MS. SMITH: So that we can be sure that happens.

THE COURT: Yes, by affidavit or declaration.

MS. SMITH: Thank you.

(Sneezing in the courtroom)

MR. JONES: Bless you.

And I can prepare that and just email it to Pretrial. Would that be best? And -- and --

THE COURT: Yes.

MR. JONES: -- counsel? Okay.

THE COURT: Yep.

MR. JONES: All right.

THE COURT: Okay. So let's make sure you've got all that in the pretrial conditions. The restriction, so his travel is restricted to the Eastern District of Michigan. Yeah, so that is a change.

It's zero tolerance as to any contact with a victim.

His GPS will have a curfew or he's got a curfew that

goes with his GPS. He's on the curfew all the time -- the -- the GPS all the time, but his curfew is 8:00 a.m. to 8:00 p.m., which can be adjusted by Pretrial Services at their discretion for educational purposes when he has a class scheduled.

He's to have no firearms, destructive devices or dangerous weapons, and he has to turn over any such within 48 hours with proof from the person receiving them and keeping them by either declaration of affidavit. And his -- when I say declaration, I mean declaration under penalty of perjury.

And the Pretrial Services is authorized to direct treatment for drugs if he tests positive.

You got all that?

MR. ROBERTS: Yes, Your Honor.

THE COURT: Okay. Anything further on this matter?

MS. SMITH: Not from the United States.

THE COURT: Anything further?

MR. JONES: No, thank you.

THE COURT: All right. Thank you. All right. I want you to succeed in this. Take that American government class, okay? Pretty interesting. Thank you.

(Brief pause)

THE CASE MANAGER: Court calls Case 26-20306, United States of America versus Paige Feyock.

MS. SMITH: Good afternoon, Your Honor. Maggie Smith appearing on behalf of the United States.

THE COURT: I should say good evening at this point.

MS. SMITH: Right.

THE COURT: Okay.

MR. HALL: Good afternoon, Your Honor. Cyril Hall on behalf of --

THE COURT: Okay.

MR. HALL: -- defendant, Ms. Feyock.

THE COURT: All right. And you're Paige Feyock. Okay. It's Fie-yock [phonetic], right?

DEFENDANT FEYOCK: Fie-yook [phonetic].

THE COURT: Fie-yook [phonetic]. I said that the first time and then I thought you -- Fie-yook [phonetic]. Okay.

Okay. Mr. Hall, what would you like to tell us? I have read your brief.

MR. HALL: Thank you, Your Honor.

That's what I was going to indicate to the Court. And unfortunately we had to file that, but the government had filed a brief, I knew the Court would read it. And I could only see my client at 4:00 o'clock yesterday. And so as a result of that, when I was leaving I found out it was a brief in the office, so I wanted to respond because the last time I saw one of your great opinions, I -- I tried to appeal it and I lost, so I knew I needed to respond, so...

My client, as you know --

THE COURT: Well, now I'm duly complimented. Go ahead.

MR. HALL: My -- my client has no criminal history as the Court notes from the -- from the report in this particular matter.

She's a high school graduate from the International School in Indianapolis. In addition to that, Your Honor, she went to Wellesley College, graduated with distinction. She's a member of multiple societies, and also she had offices with respect to the groups that she was involved in. All of it was nonviolent of course.

In addition to that, Your Honor, she -- after college, she ultimately came to Michigan in '23 and she determined that she wanted to be a physician, so she started taking the classes necessary to complete all of her premed studies. She did that with distinction. And as a result of same, Your Honor, she was ultimately awarded a scholarship to go to medical school in Chicago.

Also the Court should -- should note that in terms of her following directions, she's done over a thousand hours of community service in the medical field, obstetrics. She's also a doula, as counsel had indicated earlier about her background. And being a doula and involved in OB, Your Honor, she's seriously concerned about life and she's been involved in the furtherance of life, not taking a life.

In addition, as the Court is aware, there's no actual crime of violence here in terms of her actions. When you look at the indictment in this particular matter, I was able to go over with my client each and every count that she's charged with. She was never present at any of the acts where there was those malicious destruction of property issues that occurred.

There's issues as to whether or not she put something on the -- out in the media about -- or communication to other individuals. We contest some of that, although we'll -- we'll deal with that in the course of discovery.

I would respectfully ask the Court to adopt the recommendation of the department in this particular matter, but, Your Honor, I'm concerned about the -- the fact that she was going to go to medical school in Illinois. I was going to respectfully ask the Court, if you were going to permit her bail in this particular matter, to permit her to attend school. She's supposed to start on June 24. Her parents are present in court at this time, Your Honor. They flew in this morning. Obviously they're concerned about her.

THE COURT: They flew in from Georgia is it? No. Georgia.

MR. HALL: The father was there, yes.

THE COURT: Mm-hmm.

MR. HALL: And as indicated, they're present, Your Honor, and they're very concerned about this particular matter.

We had occasion to meet earlier today after they got in town, and then I came in again and I saw my client.

We look at the factors, Your Honor, the Court has already articulated the -- factors as it relates to number one, the type -- we know that this is not a presumption case. We recognize and do not minimize the seriousness of this particular matter.

The suggestions of the fact that my client would appear, she would definitely appear. The only time she was out of the country was school related, as made reference to in the Pretrial Services Report, and she went to South Africa. And of course when she was in South Africa was for purposes of studying how people can get together post-apartheid, so she's -- she tries to build bridges as opposed to destroy bridges.

So there's a concern in this particular matter. Of course, over the years, a lot of years earlier on I've represented individuals that have been involved in violent crimes. But I've talked to her, Judge. Whatever the state stated, I do not see any -- any violence in her and I don't think that she's a danger to the community. She's not going to be a danger to the community, Your Honor.

Law enforcement went to her residence. After they did that in '25, in April of '25, she set upon trying to make sure she could get into medical school and she was successful

at it, Your Honor.

And I would respectfully urge upon the Court to give her the -- the bail recommended by Pretrial Services, but I was concerned about the -- the tether. Judge, if the Court were going to adopt that, I would respectfully ask you not to adopt that particular restriction because of the fact that I think it's difficult to go in and out of the -- to school with that particular apparatus on. I would ask the Court to come up with another condition, even if we increase the -- the phone calls or the contact with Pretrial Services more, but try to avoid the -- the tether in this particular matter.

(Brief pause)

THE COURT: All right. Ms. Smith?

MS. SMITH: Thank you, Your Honor. Brief rebuttal please.

This -- again I want to emphasize that this is not a situation that got out of hand. This is not a situation where intelligent people made a mistake. These actions were planned, they were researched, they were calculated, and they were performed over and over and over again. Make no mistake that Ms. Feyock has not gone down a mistaken path. She absolutely believes that it is, quote, "her duty" to Palestine to damage, disrupt and destroy the colonizers' operative by any means necessary. We cannot say she's seriously concerned with life when she suggested that it was also her civic duty to bomb a

pro-life building for a school organization.

THE COURT: And to firebomb the University of Michigan.

MS. SMITH: Correct, because it has, quote, "no redeemable qualities."

Now, the organizations that she's been involved in include SAFE and TAHRIR organization who are first in on posting these threats online. Now, you can't do both. You can't pretend to be some sort of innocent victim who got into medical school and we should not prevent her from doing that, where at the same time she and her colleague are talking about being dirty doctors, and I would wager to say that the people who might be most afraid to cross her path would be a pregnant Jewish woman or anybody who doesn't meet the qualifications that she believes you should have in order to be treated as a human being.

Your Honor, this defendant despises this country. She hails glory to terrorists and she calls our country fascist, and now she's faced with serious felony charges that are not going to go away by protesting, they're not going to go away by some pressure for political beings to dismiss the charges, and for all of these reasons, she should be detained pending trial.

MR. HALL: Judge, it's interesting. The -- you know, that -- that's salacious on behalf of the prosecution, these

particular comments. This is an individual that does recognize the country. She's going to abide by the terms of this Court.

In addition to that, Your Honor, you have a situation where she's been working at the University of Michigan, she's been volunteering at the University of Michigan, continues to do it to this day, and was not going to leave until the date that she was going to go to medical school.

In addition to that, Judge, when you talk about these -- these claims -- and -- and for me, when I -- when I hear all of this, Judge, this is almost like starting my -- my life over because all of this stuff that -- that we're talking about, the protesting, I lived with it, I lived through it.

I know my client from talking to her. I know her from talking to her family. But when we talk about any means necessary, I talked to my granddaughter about that. I said by any means necessary? Yes, do your work by any means necessary. It's no excuses. You -- you have all day, all night. Make sure you do your work by any means necessary.

A lot of this stuff is -- is talk. You know, before they were talking about individuals with the Second Amendment. Well, I remember when the Black Panthers couldn't even have weapons because of the Second Amendment. They got killed for that.

And protest, Judge, what happened with -- with protest and all the things that I saw and was raised up with,

the protest caused us to have careers.

So now she's -- she's -- she's --

MS. SMITH: Your Honor, I'm going to object to this personal narrative.

MR. HALL: Yeah, but --

THE COURT: It's argument. Go ahead.

MR. HALL: Yeah. So Judge --

THE COURT: Overruled.

MR. HALL: So in -- in -- in a situation like this, there's been some statements made. I'm satisfied she understands the error of her ways. We're not here for purposes of sentence, but we're here for the question as to whether or not the Court can come up with conditions that can assure her appearance in court. I submit to the Court that there are a number of conditions that would, in fact, do that.

THE COURT: Ms. Smith, is there any evidence that she took steps to carry out any threats of firebombing, of burning a cross on a "brown" professor's front yard, or of firebombing an abortion clinic, or excuse me, a pro-life clinic?

MS. SMITH: It was a pro-life club. It's a pro-life --

THE COURT: A pro-life -- I said -- I corrected myself, a pro-life organization.

MS. SMITH: I do not.

THE COURT: Okay.

MS. SMITH: I would also remind the Court she's a dual citizen of Germany.

THE COURT: I understand that.

Is Pretrial Services officer here?

MR. WEILAND: Yes, Your Honor.

(Brief pause)

THE COURT: All right. Ms. Feyock, I have the same considerations to make for you under the Bail Reform Act. You were charged differently than some of the others. You were charged in multiple counts — looks like six counts for conspiracy to transmit threats in interstate and foreign commerce and one count for witness intimidation.

And the -- the evidence that the government has shown with respect to you is very troubling, not only that you engaged in countersurveillance, used a police scanner, and showed a desire to engage in violent activity, but that you discussed firebombing the University of Michigan and also a pro-life organization, apparently because you don't agree with their views. And again we come back to the fact that there are a lot of people's views we don't agree with in this country. It's not an option to commit any acts of firebombing. An act of firebombing is -- really is an act of terrorism, and -- and that's what you've threatened to do.

You also indicated your intention, according to the evidence, to make regents feel scared. That one particular

person, you wouldn't stop until they killed themself and that you would go after the regent's children. That is a very, very disturbing set of facts. It's a disturbing set of facts that gives the Court a lot of pause.

You discussed taking a regent hostage, making her walk around campus naked, shouting "shame" and shaving her head.

And then you discussed building something like the Weather Underground, which was a terrorist organization in Ann Arbor in the 1960s.

And then you -- you're quoted as saying "the feds -- if the feds figure out how to get all of these disappeared signal messages, it's over," so there's looking like you're trying to hide the evidence.

And then discussion of firebombing the University of Michigan, as I said, particularly a new building to make a point.

You also apparently supported burning a cross on the front yard of a "brown" professor, and "brown" is in quotes. I assume that means a person of color, which makes no sense to me. And people for many decades and still to this day are terrorized that way. It's a horrible, horrible thing to have a cross burned on someone's home or to have a Hamas symbol placed on a Jewish property. So they're very, very disturbing.

But I asked the prosecutor were there any evidence of

you taking steps to actually do these horrific things that you threatened to do, and the answer was no. And there's been a year since any of that was done, and I don't know what happened with this storm. And storm is really a light word. I agree with Ms. Smith, you know, you can't understate this kind of stuff and it's hard to come up with words that say it accurately. But this is so misguided and so filled with hate, and I just don't -- I don't get it why human beings should hate each other so much, even if we deeply disagree with each other.

And that's -- that's troubling for someone in the medical field, really troubling. It's troubling, as Ms. Smith has said, to think how will you treat your patients? Will you treat them on the basis of their religion? Will you treat them on the basis of their ethnicity? Will you treat them on the basis of the color of their skin? Are we not beyond that for an educated person? So very, very troubling.

But I do take into those -- account those mitigating factors of the lack of steps to actually carry that out and of the time that's passed without any further incident. And I also take into account, as I did before, the fact that no one was actually physically harmed, that you're not known to have had weapons in your possession.

And -- and that you -- I look into your background and -- so this is on the first factor. You know, it's a mixed factor for you. It's -- it goes poorly for you but I see the

mitigating circumstances.

The second factor, I'm not seeing a real risk that you're not going to appear. You have had some international travel, it was -- it was back. I do think, you know, you have a -- you have dual citizenship, but you're going to have to turn in your German passport and your American passport and you're not going to be able to apply for any other passport. You're not going to have any international travel, that's for sure. But I also -- I look at that and I look at your lack of a criminal history.

I look at your highly educated background. I mean Wellesley is an extraordinary school. Unfortunately, I've only visited Vassar. It's probably your competitor. And you've got postgraduate premed program at the University of Michigan, one of the best universities in the country, if I say so myself, and then you're now admitted to medical school in Chicago. You've got a lot of incentive to stay on the straight and narrow, but whether you will or not is going to be up to you.

So -- and you have strong family support and, you know, a lot of stability in your life.

You -- you don't have a mental health history. You don't have a substance abuse history, and, in fact, substance abuse testing turned negative. So all that is in your favor.

And then there's a question of danger. And I think, you know, if you turn your thoughts and your words into

actions, you're very dangerous, and that's what gives the -- the Court pause, but you didn't and in the last year you haven't.

And -- and so the Court will find that you're eligible for bond. The Court will impose a $10,000 unsecured bond.

I am going to impose a tether. I don't -- I know it's going to be a problem for you going to medical school with a tether on but that's kind of where we are, and I don't feel comfortable with you out and about without people knowing where you are.

It's going to be a $10,000 unsecured bond. You've -- you've heard this before, right, so you know you don't owe the government money now but you would later if you were to violate it. If you violate it, your bond can be revoked, you could be placed in jail through trial. On top of that, your -- your behavior on bond could be considered if you were going through a sentencing because of a conviction or a plea.

First condition, you have to report as directed to Pretrial Service Agency as directed. Now, for now that's going to be the Eastern District of Michigan. In the event of when we get to the point where you're headed to medical school, because I am restricting you to the Eastern District of Michigan and the Northern District of Illinois, which is where your medical school is, your supervision will probably be

turned over to the Northern District of Illinois. Quite frankly, I'm sure it will, but we're going to ask for them to do that on a courtesy basis.

You have to surrender any passport, enhanced identification or other international travel documents immediately to the supervising officer as directed.

You're not to obtain a passport, enhanced identification or other international travel documents.

You're to avoid all contact, directly or indirectly, with codefendants. When I say directly or indirectly, I mean exactly that. You know, there's some evidence of people thinking they're really clever about being able to communicate with each other, but don't do that because you're going to get yourself in trouble by doing that. You need to stay away from each other. You are not helping each other at all. You're all just digging yourself a deep hole by your contact with each other, or have dug yourself a hole according to what's been proffered here. So staying away from each other will help, and it will also keep you hopefully away from any criminal conduct.

You're not to have any contact with any victims. If you do, it'll be zero tolerance. Please note that for Pretrial Services, zero tolerance for contact with victims, directly or indirectly. Any communication with a victim gets traced back to you, the bond will be revoked.

You're not to possess a narcotic drug or other

controlled substance unless prescribed by a licensed medical practitioner. And that -- marijuana, I don't care if it is prescribed by a licensed practitioner, it's illegal under federal law and I won't recognize it. It'll be considered a bond violation.

You're to submit to drug testing as directed by Pretrial Services and participate in substance abuse treatment as directed by Pretrial Services.

You will participate in GPS location monitoring. What I'm going to do at this point is I'm -- well, I'm going to impose -- because of the danger that the evidence shows that you do pose, I'm going to impose on you home detention. Home detention does allow you to get an education, it does allow you to have employment. I'll tell you exactly what it means. I had it out, now I don't. Just a minute.

(Brief pause)

Home detention means you're restricted to your residence at all times except for employment, education, religious services, medical, substance abuse or mental health treatment, attorney visits, court appearances and court-ordered obligations. Obviously that -- that gives you a carveout for your medical training.

When you -- if you make it through medical school, and I -- I think you will, you know, as that you have the capability to do so, you're going to have to take a Hypocratic

Oath that "I will do no harm to anyone." If you really want to be a doctor, then you need to be reflecting on that oath. And if you're talking about doing harm, then your heart's in the wrong place. If you're threatening to do harm, your heart's in the wrong place. So you gotta think about who you want to be. Yeah, so that'll be the issue with respect to that.

You have to comply with all requirements and pay the costs of the program based on ability to pay as Pretrial Services officer determines.

Did you hear all of those bond conditions?

DEFENDANT FEYOCK: Yes, I did, Your Honor.

THE COURT: Did you understand each -- each and every one of them?

DEFENDANT FEYOCK: Yes, I did, Your Honor.

THE COURT: Is there anything further from the government before I have her sign the bond?

MS. SMITH: Yes, I am -- I am concerned about the status of these two passports, where they're located and how expeditiously they will arrive here.

THE COURT: Yes.

MR. WEILAND: Your Honor, Matthew Weiland on behalf of Pretrial Services.

I did reach out to family prior to today's hearing indicating it -- it would be prudent to bring those. I believe they did bring them today.

THE COURT: Thank you. Let's turn them in.

MS. SMITH: I am, for the record, bringing both passports up.

THE COURT: Okay. Can you verify it's both an American and a German passport there please and that they appear to be valid?

MR. WEILAND: I don't read German, Your Honor, but it appears valid.

THE COURT: Okay.

MR. WEILAND: And the United States passport is good.

THE COURT: Okay. Well, the court will be shocked to know I don't read German either.

Okay. All right. Very good. So that's been accomplished.

All right. Can you tell me you'll abide by all the conditions?

DEFENDANT FEYOCK: I will abide by all the conditions.

THE COURT: All right. All right. Anything further from you, Mr. Hall?

MR. HALL: No thank you, Your Honor.

THE COURT: All right. When you sign the bond, I'll sign the necessary papers for your release. You don't want to find yourself back in front of a judge in this case answering for a bond violation. Understand?

DEFENDANT FEYOCK: Yes, I do, Your Honor.

THE COURT: Okay. All right. Thank you.

MR. HALL: Thank you.

MS. SMITH: Thank you.

(Brief pause)

THE CASE MANAGER: Court calls 26-20306, United States of America versus Jonathan Zou.

MS. SMITH: Good afternoon, Your Honor. Maggie Smith appearing on behalf of the United States.

THE COURT: Afternoon again.

MR. WEISS: Good afternoon, Your Honor. May it please the Court, Arthur Weiss on behalf of Mr. Zou.

THE COURT: Okay. You and your client have been very patient. And you are -- let me get your first name -- Jonathan, Jonathan Zou?

DEFENDANT ZOU: Zou, yes.

THE COURT: Correct. Okay. Thank you.

All right. Mr. Weiss, what would you like to tell me?

MR. WEISS: One of the things about going last is some of the issues have already been resolved, so if I don't address something, it's not that I ignored it, but if the Court wants me to go there, I will.

He is a student at the University of Michigan, majoring in mechanical engineering. He's obtained a couple of

awards during his academic career, including the International Math Modeling Competition. He was team leader and received an outstanding award. The Stanford Math Competition, he was overall second place and he was team leader. Projects that he's been involved in, Wolverine Offshore Wind from the fall of 2024 to the present. He's a team member in mechanical engineering, a team member in another program, and a team leader in another mechanical engineering program.

We've heard a lot --

THE COURT: What year is he in?

MR. WEISS: Pardon?

THE COURT: What year is he in in mechanical engineering?

DEFENDANT ZOU: Junior.

THE COURT: A rising junior?

DEFENDANT ZOU: Rising senior.

THE COURT: Rising senior. Okay.

MR. WEISS: He has signed a lease for the next academic year, and he is registered and his registration has been accepted at the University of Michigan.

There's been some talk about what transpired and whether there was an avoidance of arrest and dressing up as a female in another ethnicity and the inability to abide by rules. Two observations. One, when he was given a ban by the university, it was appealed to the, as I understand it, the

Director of Public Safety of the University of Michigan Police Department, and the director amended that bond or ban so he could attend classes and he could work. And that ban expired quite some time ago, so there was no need to dress up or feign anything. He was allowed to go there.

I think the most evidently significant thing in terms of his dealing with the University of Michigan is last summer, the summer of 2025, they conducted a seminar, lasted about four weeks, for high school students learning computer science. My client went through a background check performed by the university and was allowed to administer that program. So obviously the University of Michigan thought enough of him after conducting their own background check to allow him not only to come in contact with high school students, but to teach and mentor them.

THE COURT: When was that background check?

MR. WEISS: That was summer of 2025. And that was computer science.

THE COURT: Okay.

MR. WEISS: Secondly, there's been talk about travel. His parents do reside in China and periodically he does go back. And even though the government didn't reference it I don't believe, I'm going to advise the Court there were search warrants executed in believe May of '25, 14 months ago. Obviously people knew that law enforcement was looking at them.

My client was at someone else's residence when the search warrant was executed. They nonetheless took his devices, which they still hold, and he did go to visit his parents and came back. And the other countries that are mentioned are simply places that he stopped either -- either on the way to China or on the way back. He is a citizen of this country. He was born here and he's maintained that citizenship. He has no dual citizenship anywhere else.

THE COURT: Are there flights between the People's Republic of China and Taiwan? Or I should say the Republic of China.

MR. WEISS: If his recollection is accurate, it went from Taiwan to Hong Kong and then to Mainland China.

THE COURT: Okay. Well, Hong Kong is now part of Mainland China with a sort of different status, but it is part of the People's Republic of China. So you can do that, you can fly from Taipei to Hong Kong?

MR. WEISS: That's his recollection.

THE COURT: Okay. All right. I was just wondering 'cuz it said he was in Taiwan so I was curious about that.

MR. WEISS: He is here, he was arrested here. He came back here knowing that law enforcement was looking at him.

THE COURT: And he's a U.S. citizen, correct?

MR. WEISS: He is a U.S. citizen. He was born here, so was his brother, who normally is in Ann Arbor with him, but

his brother currently for a summer program is in New York but will be back later on.

My client has secured summer employment through Magna International in the student summer program — the HR manager is Janel Ferguson — and he will be an engineering intern.

Secondly, regarding the University of Michigan -- I apologize for not submitting a brief, but when I finally reached my client --

THE COURT: No, I'm -- thank you for not submitting a brief.

MR. WEISS: Well, i just wanted --

THE COURT: We would have been here till 7:00 o'clock at night if I had to read your brief.

MR. WEISS: I just wanted the Court to know it wasn't till about 7:00, 8:00 o'clock last night that I was able to locate him in the Sanilac County jail, and the background noise was so outrageous that we couldn't communicate, and it was only around noon, 1:00 o'clock when the transport brought him here and I was able to communicate with him. However --

THE COURT: Just coming up, I was just in a prison in Japan exactly two weeks ago and it was completely silent.

MR. WEISS: That's a thought.

THE COURT: Yeah. Go on.

MR. WEISS: However, he does have friends. I did receive a letter, and I -- I don't know if the Court wants to

have it marked. I did give a copy of it to Ms. Smith. It's just short, if I could read it into the record, Your Honor. "To the Honorable Court: I write this letter to attest to the character of Jonathan Zou. I came to know Jonathan in his capacity as a student in one of my history courses at the University of Michigan in the Winter 2025 semester. Jonathan was a superb student. He took the academic process seriously. He demonstrated intellectual inquiry. He took pride in completing assignments and course readings. He met expected deadlines and maintained a strong attendance record. My course has a relatively heavy reading load, and Jonathan was one of the few students who could comment on the readings in every class. His intellectual engagement with the course was a great asset to the classroom and to his peers.

"Because Jonathan took the classroom seriously, he was very conscious of deadlines, expectations and responsibilities. The discipline he exhibited during the semester was a model for other students. Importantly, Jonathan was a regular contributor to class discussion. His contributions were polite, respectful and courteous to other students in the classroom. He was open to divergent views, willing to think through difficult topics, and helped to contribute to a comfortable but rigorous academic environment for his fellow students.

"Jonathan never spoke out in anger or hostility. He

was warm and welcoming to various perspectives. Jonathan worked well with his group members on a semester-long group project, demonstrating his capacity to work well with others.

"My interactions with Jonathan during the semester were of the same caliber. He was always polite, courteous, respectful, and acted with integrity in the classroom. He always demonstrated a deep care and concern for others and a desire to do the right thing. He made our classroom a better place to be, and I hope that this personal character can be taken into consideration.

"Sincerely, Derek A. Ide, I-d-e, Ph.D., Lecturer at University of Michigan."

Also with us this afternoon, I would respectfully ask Dr. Stephen Ward to stand up. He is a tenured associate professor at the University of Michigan. He has never taught Jonathan but he is the faculty mentor for him.

THE COURT: What does he teach?

MR. WEISS: He is in the Department of Afro and African-American Studies, Residential College, and involved in various organizations.

THE COURT: Okay. Thank you.

MR. WEISS: Thank you, sir.

THE COURT: Thank you for coming, sir. Thank you all, by the way. Everyone who came to support anybody, I think it's just -- it's a good thing. I said it before, an American

courthouse is a public place. We -- we don't have Star Chambers where we, you know, hide away and you don't know what's going on. And -- and it means a lot when people are standing before me that they have people that support them. That doesn't change my opinion. I look at the evidence in making my decisions, but I know that some people made sacrifices to be here.

So go ahead.

MR. WEISS: Thank you, Judge.

And lastly, as it relates to his abiding by our judicial system, he is the first named plaintiff in a civil rights suit, lawsuit against the University of Michigan filed in this court before the Honorable Mark Goldsmith, given Case No. 25-cv-10315. It was filed in February of 2025 and is still pending.

I believe that whatever activities he engaged in, of reading the indictment, ceased in Feb -- in October of '25 or '24, excuse me. It's a year and a half ago. There's no allegations in the indictment beyond that. I know Ms. Smith made some arguments as to other things which I -- I -- I can't comment on. But I did read the indictment. Admittedly, there's allegations of vandalism. I didn't see anything about allegations of physicality, physical injury, bomb throwing, anything like that. There were communications.

I respectfully submit that there is no risk of

flight. Otherwise he would have been long gone and he wasn't, and he came back knowing that he very well could end up before Your Honor some day. And the dangerousness, whatever existed, ceased a long, long time ago.

So I would respectfully submit that whatever the government may say we -- we don't know, we don't know, we don't know doesn't definitely meet the preponderance of the evidence for flight, and definitely doesn't come close to clear and convincing evidence for dangerousness. So I respectfully submit that the Court adopt the recommendation of Pretrial Services, enlarging my client an unsecured bond.

I would ask the Court to take a deep look as to whether or not it feels that the electronic monitoring is necessary given the fact that, again, he -- he was subjected to a search and seizure 14 months ago, did some international travel to see his family but did come back, has been admitted to the university for the upcoming academic year and has made arrangements for living and housing.

THE COURT: Okay. One moment.

(Brief pause)

Ms. Smith?

MS. SMITH: Thank you, Your Honor.

I would just note that this letter of recommendation comes from a professor whose research is focused on anticolonial and internationalist movements challenging

imperialism in the 20th century. When I look at this particular defendant, he --

THE COURT: We're allowed to discuss those things in -- in a classroom, aren't we?

MS. SMITH: Yes.

THE COURT: Okay.

MS. SMITH: You're allowed to discuss those things. But I would suggest to the Court that when -- when I look at this particular defendant and the amount of indoctrination he's received from Hamas and Hezbollah, I would wager to say he is on the road to being fully radicalized, and that's what makes him dangerous in terms of the thinking and the rejection of American values. And for all of the reasons that I stated before, he too should be detained.

THE COURT: Thank you.

MR. WEISS: Would the Court care me -- care for me to respond?

THE COURT: You absolutely may.

MR. WEISS: First of all, simply because the professor teaches certain subjects and writes about them, I recognize that we're in troubled times, but I trust that the academic exercise of exploring thoughts and topics does not end up in Title 18 USC.

Secondly, in terms of whatever postings there were, I'm not aware nor did I hear Ms. Smith contend that they were

acted upon, and nor have I heard anything that transpired in the last 18 months.

So again, we're dealing with the concept of current potential flight, current potential dangerousness, and with all due respect to the government, they haven't commented on either one and they have not satisfied their burden both as to flight and dangerousness. And I respectfully renew my request for release as set forth by Pretrial Services, with a second look at electronic monitoring.

THE COURT: Okay. Mr. Zou, you -- you're very accomplished in school. You're -- mechanical engineering's a very hard field, and you're -- you're climbing your ladder -- climbing that ladder and you're almost there. I don't know if it's a four-year program or five-year program for mechanical engineering. But I see that you've not been a person who's just stayed with mechanical engineering. You've also taken other courses outside that area. Maybe they were required, maybe they weren't. And apparently you -- you are quite adept at math, which every lawyer in this courtroom can say is not us, I think.

You know, the thing that really strikes me is that you are incredibly smart. You go to a great university and you're incredibly smart, but the actions that the grand jury found that there was probable cause to believe that you committed are incredibly dumb and in some cases incredibly

mean. And I hope that's not the person you want to be because you have so much potential, it's so obvious to the Court.

You have had extensive travel to China, but it makes sense to the Court because your parents are there. Why wouldn't you go to China? And the particular thing that's striking after you knew you were under investigation 'cuz the search warrant had already been carried out, you went to China and you came back. And the travel that you have does seem to be related to travel to China, Korea and Taiwan, very near China, and likely places where you'd be changing planes to go to China, particularly if you're on a limited budget. And that is striking to the Court that you've come back. And you won't be going there now. Now that you're on bond, you're not going to be going anywhere outside the United States and you'll have to turn in your passport.

I am -- you know, again, I don't need to repeat 'cuz you've heard me say it, but the -- the acts that are alleged here are troubling, to say the least. This business about you dressing yourself up as a Muslim woman to avoid being seen sounds as much silly as it does as an attempt to get around law enforcement. And your attorney has already indicated that -- one moment -- that you got a background check from the University of Michigan in 2025 apparently after all that happened and cleared it to be able to work with high school students. One would think that the University of Michigan

would pick up on activities that -- that they had with you and that as apparently the director amended the prior ban, so I take all that into consideration.

You know, you have a lot to -- to live for and to strive for. You could really screw it up by screwing up your bond conditions, by not abiding by your bond conditions 'cuz you'd wind up in jail pending trial. And if you wind up in jail pending trial, your ability to put on an effective defense to these charges is going to be diminished because you won't be able to meet with your attorney as often and you won't have the access to materials that you need to prepare.

I note that you got an internship. That's very good. That you are a United States citizen despite the fact that your parents live there. And that you are not alleged to have actually injured anyone or thrown any bombs, or there's only, let's see, three -- three of the counts for conspiracy to transmit threats in interstate and foreign commerce are alleged against you. And so it's clear to the Court from that and also from even what little is in the government's brief, ECF 42, about you that you are not kind of the main mover and shaker in this alleged conspiracy.

One moment.

(Brief pause)

You do -- as the government has said, is you're receiving -- the government has alleged that you're receiving a

constant flow of American and Jewish hate. That again hurts my heart to hear, but this isn't about how I feel. This is about trying to respect your rights, notwithstanding the fact that some of the rhetoric that you're apparently buying is so hateful and so destructive, and that you've stated that you're the strongest soldier among the conspirators, but that may be an overblown sense of yourself within this conspiracy because the allegations don't really indicate that.

There was some discussion of the fact that the professor who has come to this court to support you teaches an anticolonialism course, I forget the entire -- entire -- entire title of the course or the entire -- entire title of the specialty, but it's hard to imagine that too many people are running around today in favor of colonialism, so I'm really not really sure what I'm supposed to get from that.

And again, there's -- there's no law against -- if anything, it's protected by the First Amendment to be able to explore those topics even if one disagrees with them, and if one disagrees with them, you don't take the course. But those are courses -- not easy to get a course approved at the University of Michigan, or any other university for that matter, and when you do it goes through a rigorous process and -- and students can choose to take them or not take them.

I would caution you though against filling your mind with things that -- that radical, pro-terrorist type rhetoric

because you're at a very sensitive age, and you're at an age where you can be influenced more than you think you can and manipulated more than you think you can by others. And I always told my undergraduate students think of yourself, think critically, and don't let others manipulate you as to how to think. And there's a lot of influences out there. You know, there's the media, there's biases that people have, and they can all affect us and they can all -- whether we know it or not. And so you need to be careful as to what you take in because what you take in sometimes then comes out and it also destroys your own heart.

But I do feel that you are bondable, and under these factors, the 18 USC, Title 18 of the United States Code Section 3142, I don't think that you're a serious risk of nonappearance in this court if we fashion the proper conditions.

You will not be going to China. You will not be going anywhere outside the Eastern District of Michigan, quite frankly.

And you have a lot of things that speak for you. No illegal drug use, you tested negative. You're in good physical health. You've done all kinds of good things at a young age. You've worked as a camp counselor. You worked as a sandwich maker. You've done an -- you got an internship coming up. You're a student who's achieved much. And you don't have a criminal background. There's a warrant requested from 10-24

from the University of Michigan Department of Public Safety that apparently they never acted on, and that was likely related to those protests.

And again, as your attorney stated, while you've talked the talk and maybe just taken in a lot of the rhetoric, you're not the big cog in this wheel. And you're also not -- it's not shown that you have acted on these things in a way that where you've actually harmed a human being or you -- there's no evidence of you having weapons or anything of that nature.

So I'm going to order that you be released on a $10,000 unsecured bond. You're not putting up any money but you'd owe the government $10,000 if you violate your bond conditions. If you violate your bond conditions, then your bond can be revoked and you'd be placed in jail and your time at the University of Michigan would be severely interrupted, if not ended. Think about that. Also you could be separately charged with a federal crime of violating bond conditions. And on top of all that, bond behavior will be considered at sentencing if you were to plead guilty or be found guilty.

Your conditions are as follows. Listen carefully.

You're to report as directed to Pretrial Services.

You must surrender any passport, enhanced identification or other international travel documents immediately to the supervising officer as directed. Do we have

that passport?

MR. WEISS: Your Honor, the passport was in his apartment at the time of his arrest. Law enforcement, for whatever reason, did not take it. Could I respectfully ask that it be turned in on Monday?

THE COURT: Yes. Let's hear from Pretrial on that.

MS. HARLA: Good afternoon, Your Honor. Rebecca Harla on behalf of Pretrial Services.

A Pretrial Services officer would be going to the residence tomorrow, so we can get it tomorrow if that would be...

THE COURT: Okay. It will be turned over to the Pretrial Services officer tomorrow.

MR. WEISS: Tomorrow?

THE COURT: Yes.

MR. WEISS: Are they going to be open? Will the building be open?

THE COURT: No, the Pretrial Services officer's coming to his residence tomorrow.

MR. WEISS: Oh, to the residence. Okay.

THE COURT: Correct? Yes.

MS. HARLA: Yes, that would be right.

THE COURT: Right. So at that time it needs to be turned over.

You're not to obtain a passport, enhanced

identification or any -- any other international travel document.

You are to abide by the travel restrictions on personal association, place above -- place -- place of above. I'm not sure what that means. What does that mean?

MS. HARLA: I think it's supposed to be abode.

THE COURT: Abode, place of abode, or travel.

Your travel is restricted to the Eastern District of Michigan. Talk to Mr. Weiss, find out what the borders are of the Eastern District of Michigan. I don't want to find out you got picked up in Lansing and then you tell me, "Well, I didn't know that that was in the Western District of Michigan." You need to know before you move around. And the whole Upper Peninsula is in the Western District, so there's a lot of places not far from here that will take you out of this district that will be a bond violation.

You're to avoid all contact, directly or indirectly, with any codefendants, victims or witnesses. When I say direct or indirect, I mean exactly that. You're not to contact them through social media, you're not to send messages to them through other people. It's not just face-to-face contact I'm talking about. None, no texting, nothing.

And it's zero tolerance for any contact with victims. Doesn't mean I wouldn't -- your bond wouldn't be revoked for the others, but zero tolerance on that.

Six, you're not to possess any firearm, destructive device, or other dangerous weapons.

Seventh, you may not engage in any assaultive, threatening or intimidating behavior. I'm also going to impose a zero tolerance condition on that. Pretrial have that?

MS. HARLA: Yes, Your Honor.

THE COURT: Okay. Eighth, you're to participate in one of the following location monitoring -- well, I'm going to make it clear. You're going to be under GPS monitoring, and what I'm going to do in your case is I'm going to give discretion to Pretrial Services to establish an adequate curfew, and they'll learn a little bit more about your life and they will impose a curfew. You're going to need to abide by that.

MR. WEISS: Your Honor, he resides in Ann Arbor. My office is in Farmington Hills.

THE COURT: You're in the Eastern District of Michigan.

MR. WEISS: I understand, but there have been times where a client has been precluded coming to my office and I've had to go where they are. Does the Court have a problem indicating that that's a appropriate travel?

THE COURT: Well, you know, you're allowed to visit your attorney when you're under home detention, and this is less than home detention so he should be -- he's only

restricted to the Eastern District of Michigan so he should be able to visit you.

MR. WEISS: I'm not going to quarrel with the Court.

THE COURT: I know, I know you want to clarify, but --

MR. WEISS: I have had clients that have not been able to come to my office.

THE COURT: Right. But that might have been people that were under greater restrictions is what I'm saying, likely was, okay?

MR. WEISS: Okay.

THE COURT: So -- and let's see. I guess I covered those where we said the Eastern District of Michigan. Anything else the government wants me to consider?

MS. SMITH: No, Your Honor.

THE COURT: Okay. Mr. Weiss, anything further you want to say?

MR. WEISS: If I could just confer with my client for a second.

THE COURT: Yes.

(Brief pause)

MR. WEISS: No thank you, Judge.

THE COURT: Okay. So Pretrial's got it? The three things I've added are the two zero tolerance conditions and the curfew.

MS. HARLA: Yes, we have that --

THE COURT: Thank you.

MS. HARLA: -- and we appreciate it. Thank you.

THE COURT: Thank you.

All right. All right. So Mr. Zou, did you hear all of those bond conditions we just discussed?

DEFENDANT ZOU: Yes, Your Honor.

THE COURT: Did you understand each and every one of them?

DEFENDANT ZOU: Yes.

THE COURT: Can you tell me that you will comply with each and every one of them?

DEFENDANT ZOU: Yes.

THE COURT: All right. I will sign the necessary papers for your release as soon as you sign the bond.

Anything further?

MS. SMITH: No, Your Honor.

THE COURT: All right. Anything further, Mr. Weiss?

MR. WEISS: I'm sorry, Judge.

THE COURT: Anything further?

MR. WEISS: No.

THE COURT: Good. All right. Thank you.

MR. WEISS: Unless the Court has anything else.

THE COURT: No. I have another detention hearing, believe it or not.

MR. WEISS: Ah. Well, the court staff have an enjoyable weekend whenever you get out.

THE COURT: Thank you.

(Proceedings concluded at 5:25 p.m.)

\- - -

C E R T I F I C A T I O N

I, Linda M. Cavanagh, Official Court Reporter for the United States District Court, Eastern District of Michigan, do hereby certify that the foregoing pages 1 through 121 comprise a full, true and correct transcription, to the best of my ability, of the digital sound recording taken in the matter of United States of America vs. D-1 Zainab Aliasgar Hakim, D-3 Paige Elizabeth Feyock, D-5 Jonathan Hongru Zou, D-8 Colin Hunter Weger, Case No. 26-20306, on Friday, June 12, 2026.

s/Linda M. Cavanagh
Linda M. Cavanagh, CRR, RMR, RDR, CRC
Federal Official Court Reporter
United States District Court
Eastern District of Michigan

Date: June 18, 2026
Detroit, Michigan