UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

ZAINAB HAKIM, et al.,

Defendant.

CRIMINAL NO. 26-20306

Honorable Judith E. Levy

**United States' Response and Brief Opposing All Defendants' Joinder and Supplemental Motion for Judicial Appointment for a Master to Review the Contents of Electronic Devices (ECF No. 178)**

For the reasons stated in the attached brief, the Court should deny the defendants' Motion.

Respectfully submitted,

JEROME F. GORGON, JR.
United States Attorney

<u>*s/ Dominic X. Barceleau*</u>
Margaret M. Smith
Robert M. Kuhn
Dominic X. Barceleau
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 224-9186
dominic.barceleau@usdoj.gov

Dated: October 19, 2026

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

UNITED STATES OF AMERICA

v.

ZAINAB HAKIM, et al.,

Defendant.

CRIMINAL NO. 26-20306

Honorable Judith E. Levy

**United States' Brief Opposing Defendants' Joinder and Supplemental Motion for Judicial Appointment for a Master to Review the Contents of Electronic Devices (ECF No. 178)**

Jonathan Zou filed a motion for judicial appointment for a special master (ECF No. 171), and the government responded in opposition. (ECF No. 175).[1] After this response, the remaining defendants joined Zou's motion and filed a supplemental brief. (ECF No. 178). Potentially privileged communications are already removed, so there is no need for a special master. Further, Sixth Circuit precedent supports the use of government filter teams to protect potentially privileged communications. Nothing about this case requires a special master, and the practical considerations weigh heavily against one. And the Fifth

[1] The United States incorporates that response here.

Amendment privilege does not extend to attorney identities. The Court should deny the defendants' motions. (ECF Nos. 171, 178).

**Background**

During this investigation, law enforcement executed numerous search warrants including (1) electronic devices seized in April 2025; (2) iCloud accounts seized in January 2026, and (3) electronic devices seized in June 2026.[2] The United States—aware that some defendants were represented—began a standard filter protocol for the relevant seized devices and accounts. No one from the investigative team has seen any of the filtered data. Nor will they. And no one from the filter team has reviewed the filtered data or made any determinations about whether the data contains privileged communications. The United States has and will continue to follow its legal and ethical obligations, and it will remain overly inclusive out of an abundance of caution to protect the defendants' potentially privileged communications.

---

[2] All the devices and iCloud accounts seized in April 2025 and January 2026 subject to the filter protocol have been filtered. The extracted devices seized in June 2026 subject to this protocol have also been filtered. The devices in the process of extraction that were seized in June 2026 will undergo the same filter protocol.

Since the arrests in June 2026,[3] no defense attorney contacted the FBI or the U.S. Attorney's Office to assert privilege. In further abundance of caution, an Assistant United States Attorney contacted defense counsel in this case to confirm that the government had all the attorneys' names. Zou refused to provide the names and, for the first time, objected to the government's use of a filter team. Two attorneys later confirmed that they had no privileged information in the seized devices. The rest of the defendants did not respond.

Now—three weeks after Zou's motion and after the government's response—the other defendants join his motion, taking a second bite at the apple with new arguments. Like Zou's, their motion lacks merit. For most of the seized devices and accounts, the filter team has already removed potentially privileged communications. And the same protocol will apply to any devices in the process of extraction. The government's filter protocol—described in detail in the government's response to Zou's motion—adequately protects any *potentially* privileged attorney-client communications. (*See* ECF No. 175, PageID.985–88). The defendants fail

[3] D-2 Amatullah Hakim was arrested in July 2026. The indictment was unsealed in June 2026 when the other defendants were arrested. And she is D-1 Zainab Hakim's sister.

to explain why there is a unique need for a special master in this routine scenario. Let alone how a special master would do anything more than the government has already done. The Court should deny the motions.

## Argument

### I. Filter teams are a widely approved practice for protecting privileged information seized under a search warrant.

The defendants' claim that there is a need for a special master, or that they should conduct their own privilege review, fails. (*See* ECF No. 178, PageID.1012; *id.* at PageID.1017). The defendants are wrong on the law and their approach would bring investigations to a halt. This is a common scenario, and the defendants provide no unique or unusual circumstances to justify a special master.

#### A. The Sixth Circuit does not require a special master whenever a defendant asserts privilege, nor does it give defendants the right to review lawfully seized evidence in the first instance.

Start with the law. The defendants incorrectly read *In re Grand Jury Subpoenas*, 454 F.3d 511 (6th Cir. 2006), and its progeny to give defendants and investigative targets the right to preclear information seized by a valid search warrant. (ECF No. 178, PageID.1017). The defendants gloss over four critical differences between *In re Grand Jury* and this case.

***First***, *In re Grand Jury* (as the name suggests) involved a grand jury subpoena, not a search warrant. *See* 454 F.3d at 516. The process for asserting privilege in response to a subpoena is different than a warrant. With a subpoena, the recipient has "the right to conduct their own privilege review" before handing the documents over to the government. *Id.* Privilege review became an issue in that case only because the government subpoenaed a *third party*. So the question was whether the target could review the documents before the third party produced them—as he would have been allowed to do if the government subpoenaed the records directly from him. *Id.* at 512, 516.

Search warrants are different. A "subpoena simply requires the person to whom it is directed to make the disclosure." *Carpenter v. United States*, 585 U.S. 296, 329 (2018) (Kennedy, J., dissenting). A warrant "allows the Government to enter and *seize and make the examination itself*." *Id.* (emphasis added); *see also United States v. Blank*, 459 F.2d 383, 385 (6th Cir. 1972). And unlike subpoena recipients, search-warrant recipients have no "opportunity to present objections" before the government seizes property. *See Oklahoma Press Pub. Co. v. Walling*, 327 U.S. 186, 195 (1946). In short, *In re Grand*

*Jury* maintained the status quo for subpoena recipients. It did not create a new right to preclear materials the government has seized with a valid warrant. Indeed, the court acknowledged that filter teams are used primarily when "government officials have already obtained the physical control of potentially-privileged documents through the exercise of a search warrant." *In re Grand Jury*, 454 F.3d at 522.

***Second***, the filter procedures here avoid the central problem the court identified in *In re Grand Jury*. The defendants will have the opportunity to review *all* seized information and assert privilege in the unlikely event that the filter team misses something. That "check" was absent from the procedures in *In re Grand Jury*. 454 F.3d at 523. There, the filter team would return only the documents it flagged as privileged. *Id.* at 517. And because grand jury proceedings are secret, the filter team provided nonprivileged materials "directly to the investigators and the grand jury" without ever giving the privilege holder the "opportunity to review those documents." *Id.* In other words, the privilege holders would not be able to "check" the filter team's work for "false negative conclusions." *Id.* at 523.

That risk does not exist here. After the filter team finishes its review, the government will produce a full copy of the seized information to the defendants in discovery, along with a copy of the information it filtered out. So the defendants will have the opportunity to assert privilege over any documents the filter team may have missed. That opportunity is all *In re Grand Jury* requires.

Further, most of the defendants have refused to provide information about their representation. The government has diligently reviewed civil and criminal dockets to compile a list of any attorney representations. But the defendants have rejected the United States' good-faith efforts to ensure that it has all attorney representations. They should not benefit from their lack of cooperation.

Filter protocols are routinely used during investigations—often while such investigations are still covert. And courts, including the Sixth Circuit, have routinely approved of their use, even when the defendant would learn of any errors after the prosecution team has seen the material. *See, e.g.*, *United States v. Patel*, 579 F. App'x 449, 459–60 (6th Cir. 2014) (approving use of a filter team to monitor recorded phone calls that included attorney-client conversations during covert

investigation); *United States v. Coffman*, 574 F. App'x 541, 564 (6th Cir. 2014) (rejecting defendant's claim that filter procedure violated due process where independent team reviewed seized materials and categorized as privileged, possibly privileged, and not privileged); *United States v. Zigmond*, No. 15-20283, 2017 WL 3149207, at *3 (E.D. Mich. July 25, 2017) (Steeh, J.); *United States v. Taylor*, No. 21-cr-00013, 2022 WL 9408779, at *3 (E.D. Ky. Oct. 14, 2022).[4] In these cases, the opportunity to object after the investigation team reviewed the information was sufficient. Other courts have concluded likewise. *See, e.g.*, *United States v. Scarfo*, 41 F.4th 136, 174 (3d Cir. 2022); *United States v. Proano*, 912 F.3d 431, 437 (7th Cir. 2019); *United States v. Avenatti*, 559 F. Supp. 3d 274, 281 (S.D.N.Y. 2021); *United States v. Manzi*, 2021 WL 3206829, at *3 (D. Neb. July 29, 2021); *Heebe v. United States*, 2012 WL 3065445, at *3 (E.D. La. July 27, 2012); *United States v. Sutton*, 2009 WL 481411, at *9 (M.D. Ga. Feb. 25,

---

[4] In the government's response to Zou's motion, parentheticals for *Zigmond* and *Taylor* mistakenly described the filter protocols as allowing the defendants to review before the prosecution team. The defendants' review occurred after. *See Zigmond*, 2017 WL 3149207, at *2; *Taylor*, 2022 WL 9408779, at *3. So in both cases, the opportunity to object *after* the investigation team's review was sufficient.

2009). So the defendants' claim that the ability to "cure" any potential errors would be too late falls flat. (*See* ECF No. 178, PageID.1014)

Relatedly, the defendants' argument that these cases arose from a different posture is unavailing. (*See id.* at PageID.1013). The defendants cite no cases in support of their claim that "[w]hether a remedy is warranted after the fact is a different question from which procedure should govern before review occurs." (*Id.*). Even assuming that is true, the filter process has already occurred for most of the seized devices and accounts, so the posture is the same.

***Third*,** the filter protocol here is more protective than the one the government sought to use in *In re Grand Jury*. There, the government sought to make not just the first cut review: whether communications "contain[ed] names of attorneys or law firms." *In re Grand Jury*, 454 F.3d at 524. They also sought to perform the second cut: whether the substance of the communications was privileged. *Id.* at 517. Here, the government will stop at the first cut and filter out *all* communications between the defendants and their attorneys without looking at the underlying substance. That leaves no room for the "honest differences of opinion" about privilege that gave the Sixth Circuit pause. *Id.* at 523.

The defendants concede that the government's proposed filter is "over-inclusive." (ECF No. 178, PageID.1015). Yet they argue that it is still not enough because the choice of "which names, accounts, and communications to treat as potentially privileged" still "embodies a privilege determination." *Id.* Not so. This "over-inclusive" approach removes every identifiable potential attorney communication. There is no privilege determination because the defendants' lawyers' names are not privileged or protected. So the defendants' objection only frustrates the government's good-faith efforts to protect the defendants' potentially privileged communications. As discussed below, the defendants have no Fifth Amendment privilege over their attorneys' names. But in any event, the Court must "guard against allowing a defendant to profit from his own" refusal to cooperate. *Illinois v. Allen*, 397 U.S. 337, 345 (1970). The government already has, and will continue to, screen out all communications "that contain names of attorneys or law firms that" the defendants "place on a list"—the very protocol *In re Grand Jury* approved. 454 F.3d at 524.

***Fourth***, because of the differences between subpoenas and warrants, the Sixth Circuit generally approves of filter teams when

"government officials have already obtained the physical control of potentially-privileged documents through the exercise of a search warrant." *In re Grand Jury*, 454 F.3d at 522; *see also Coffman*, 574 F. App'x at 564; *Patel*, 579 F. App'x at 459. Post seizure, filter teams are "respectful of, rather than injurious to, the protection of privilege." *In re Grand Jury*, 454 F.3d at 523. That's what the filter protocol here accomplishes: it removes *all* potentially privileged communications from the investigation team's access.

The court's passing remark that filter teams "seem to be used primarily in limited, exigent circumstances" does not undermine that key point. *Id.* at 522. Indeed, three circuit courts and multiple district courts have read *In re Grand Jury* to support the use of filter teams in the warrant context. *See United States v. Snyder*, 71 F.4th 555, 568 (7th Cir. 2023), *rev'd on other grounds,* 603 U.S. 1 (2024); *Scarfo*, 41 F.4th at 173; *In re Sealed Search Warrant*, 11 F.4th 1235, 1250 (11th Cir. 2021); *Avenatti*, 559 F. Supp. 3d at 282; *Taylor*, 2022 WL 9408779, at *4.

Moreover, the court's factual claim that filter teams "seem" to be used in "limited, exigent circumstances" is no longer accurate (to the extent that it ever was). *In re Grand Jury*, 454 F.3d at 522. In the

twenty years since the Sixth Circuit issued *In re Grand Jury*, filter teams have become a common and indispensable part of criminal investigations. It is not hard to see why.

In 2006, only 12% of Americans had a Palm Pilot or Blackberry. *See* Pew Research, *Online Papers Modestly Boost Newspaper Readership* § 6 (July 30, 2006).[5] Apple did not even release the first iPhone until 2007, with a maximum of 8GB of storage. *See* Press Release, Apple, *iPhone Premieres This Friday Night at Apple Retail Stores* (June 28, 2007).[6] In 2025, 91% of Americans had a smartphone. *See* Pew Research, *Mobile Fact Sheet* (November 20, 2025).[7] And the iPhone 17 comes with at least 256 GB of storage and up to 1 TB—between 32 and 125 times the max storage of the original iPhone. *See* Press Release, Apple, *Apple Unveils iPhone 17 Pro and iPhone 17 Pro Max* (Sept. 9, 2025).[8]

---

[5] https://www.pewresearch.org/politics/2006/07/30/section-6-other-findings/

[6] https://www.apple.com/newsroom/2007/06/28iPhone-Premieres-This-Friday-Night-at-Apple-Retail-Stores/.

[7] https://www.pewresearch.org/internet/fact-sheet/mobile/

[8] https://www.apple.com/newsroom/2025/09/apple-unveils-iphone-17-pro-and-iphone-17-pro-max/.

Those societal developments mean that Americans now carry around—and the government now seizes—exponentially more data than it did in 2006. So to the extent that *In re Grand Jury's* hesitation to embrace filter teams was based on their "limited" use, those concerns have not been borne out. Filter teams have proven to be an effective and efficient means of protecting attorney-client privilege.

### B. The defendants' rule has no limiting principle and would impose huge costs on the justice system.

Practical considerations also weigh heavily against a special master. Appointing a special master to sort through all privilege claims or allowing warrant-recipients to preclear their lawfully seized data would impose major costs—of time and money—on the justice system.

***Time.*** The use of a special master to sort privileged documents creates "a legitimate concern regarding the possibility of unreasonable delays." *In re Grand Jury*, 454 F.3d at 524. Investigation targets have an "obvious" motive to "delay[] matters." *Id.* at 523. Other courts have raised similar concerns that using a special master "takes too long and costs too much." *Black v. United States*, 172 F.R.D. 511, 516 (S.D. Fla. 1997); *see also United States v. Vepuri*, 585 F. Supp. 3d 760, 763 (E.D. Pa. 2021); *Hicks v. Bush*, 452 F. Supp. 2d 88, 103 & n.12 (D.D.C. 2006);

*United States v. Grant*, 2004 WL 1171258, at *3 (S.D.N.Y. May 25, 2004). In one case, the special master's review "delayed" the case "for approximately two and one-half years." *Black*, 172 F.R.D. at 514 n.4 (discussing *United States v. Abbell*, 939 F. Supp. 860 (S.D. Fla. 1996)).

The Sixth Circuit's "legitimate concern" about delay appears to be playing out here. *In re Grand Jury*, 454 F.3d at 524. The defendants became concerned about the possibility of privileged documents only *after* the government requested additional information to confirm its filter list. And even now, the defendants have raised privilege in the vaguest terms: they have not explained where the privileged data might be found and refuse to even provide their lawyers' names. Indeed, the defendants do not even pretend that this will be a speedy process. They respond only that "the speedy-trial right the government invokes belongs to Defendants, [who are prepared to address any resulting time under the Speedy Trial Act]." (ECF No. 178, PageID.1017).

But the defendants are not the only ones with an interest in the efficient administration of justice. "[T]here is a societal interest in providing a speedy trial which exists separate from, and at times in opposition to, the interests of the accused." *Barker v. Wingo*, 407 U.S.

514, 519 (1972). And delays prejudice the "prosecution's ability to meet its burden of proof." *Flanagan v. United States*, 465 U.S. 259, 264 (1984). They also "prolong[] public anxiety over community safety" when, as here, the defendants are "free on bail." *Id.* And they obstruct the community's "strong collective psychological and moral interest in swiftly bringing the person responsible to justice." *Id.*; *see also United States v. MacDonald*, 435 U.S. 850, 862 (1978).

***Money.*** On top of that, special masters are expensive. Given the volume of data implicated when the government seizes a phone or computer, special master review is likely to cost hundreds of thousands of dollars. Consider the costs from some of defendants' cases:

- **$249,715.16** in *Cohen v. United States*, No. 18-MJ-3161 (KMW) (S.D.N.Y. Sept. 27, 2018), ECF No. 106.
- **$585,392.69** in *In re Search Warrant Dated Nov. 5, 2021*, No. 21-MC-813 (AT) (S.D.N.Y. Nov. 12, 2021), ECF Nos. 59, 62, 72, 79, 84, 87, 89, 93, 100, 104, 106, 111, 115, 121, 125, 150, 156, 158.

Given the number of defendants, devices, and accounts involved here, it is reasonable to expect costs will be in the same range, or even more. And critically, the Sixth Circuit has stated that "it would be appropriate to charge the appellants [i.e., privilege holders] for the Special Master's services." *In re Grand Jury*, 454 F.3d at 524.

Even if the justice system might be able to handle the costs and delays associated with a special master under special and unique circumstances, the defendants' request here has no limiting principle. They haven't identified a single special or unique circumstance. It bears repeating: this is a routine, common scenario. If the defendants can get a special master here—after nebulous privilege claims in a routine circumstance—who can't? And the defendants' efforts to downplay these concerns are not persuasive.

The defendants argue that courts have sometimes "appointed special masters" in "politically charged, closely watched matters." (ECF No. 178, PageID.1015–16). And they cite three high-profile cases from New York where courts appointed special masters to review for privilege. Yet those cases are miles from this one. Two of the cases concerned search warrants issued to *lawyers* for the former *President of the United States*. *See Cohen v. United States*, No. 18-MJ-3161 (KMW) (S.D.N.Y. 2018) (Michael Cohen); *In re Search Warrant Dated April 28, 2021*, No. 21-MC-425 (JPO), 2021 WL 2188150 (S.D.N.Y. May 28, 2021) (Rudy Guiliani). The third involved seizures from *independent journalists* and thus raised "potential First Amendment concerns." *In re*

*Search Warrant dated Nov. 5, 2021*, No. 21 MISC. 813 (AT), 2021 WL 5845146, at *2 (S.D.N.Y. Dec. 8, 2021). Since the defendants are not lawyers or journalists, those special concerns do not exist here. Plus, even in those cases, the courts noted that "[e]ven in complex situations," courts have found that the appointment of a special master is not warranted because 'the filter team process adequately safeguards the attorney-client privilege and the constitutional rights of the search subjects.'" *Id.* at *1 (quoting *In re Search Warrant Dated April 28, 2021*, 2021 WL 2188150, at *2).

In sum, filter protocols like the one the government has used here respect and protect attorney-client privilege. This case does not present the kind of exceptional circumstances—like a warrant for an attorney's devices or law office—that might justify a special master. Granting the defendants' motion would set a time-consuming and costly precedent going forward for a routine scenario. The Court should deny the motion.

### C. The government has already applied the standard filter protocol to most of the seized devices and accounts, so there is no need for a special master.

The government has already applied its standard filter protocol to most of the defendants' seized information, as it would in any other

case. Now that the "over-inclusive" filter is essentially complete, a special master would be unnecessary. The defendants are still free to raise any challenges to the government's filter decisions after they receive discovery.

Plus, the defendants' current privilege claim is too vague. A blanket assertion of potential privilege, without more, is not enough. *See United States v. Sadler*, 24 F.4th 515, 557 (6th Cir. 2022) ("The burden of establishing the existence of the privilege rests with the person asserting it.") (citation omitted). Rather, a "party claiming the privilege must identify specific communications and the grounds supporting the privilege." *United States v. Martin*, 278 F.3d 988, 1000 (9th Cir. 2002). Even if the defendants cannot pinpoint specific communications, they must at least provide *some* detail: names of attorneys, communication platforms used, general date ranges. But their complete lack of detail "disable[s] the court and the adversary party from testing the merits of the [their] claim." *United States v. El Paso Co.*, 682 F.2d 530, 541 (5th Cir. 1982). So, as with Zou's motion, the Court should consider the defendants' request for a special master forfeited. *See Jones Bros., Inc. v. Sec'y of Lab.*, 898 F.3d 669, 677 (6th

Cir. 2018) ("[A] party forfeits any allegations that lack developed argument.").

## II. The Fifth Amendment privilege against self-incrimination does not cover attorneys' names because they are not testimonial or incriminating.

Despite the defendants' claims, the Fifth Amendment does not protect attorney names. (*See* ECF No. 178, PageID.1018–20). To be clear, the defendants do not argue that their attorneys' names and usernames are subject to attorney-client privilege. Nor could they, because "the fact of legal consultation or employment" is "not deemed privileged." *Humphreys, Hutcheson & Moseley v. Donovan*, 755 F.2d 1211, 1219 (6th Cir. 1985); *see also In re Flint Water Cases*, 2024 WL 2333734, at *1 (E.D. Mich. May 22, 2024) (a standard privilege log must "identify the attorney(s) on the communication") (citation omitted).

The Fifth Amendment protects only "testimonial, incriminating, and compelled" communications. *Hiibel v. Sixth Jud. Dist. Ct. of Nev.*, 542 U.S. 177, 189 (2004). And the defendants have not shown that their attorneys' names are either testimonial or incriminating. Nor have they cited any cases specifically supporting this claim.

It appears that the crux of the defendants' objection is the request for Internet usernames for the attorneys. (*See* ECF No. 178, PageID.1019). The request—again made in an abundance of caution by the government—is to protect against the inadvertent disclosure of potential attorney communications. Given the nature of the case, and the defendants' use of Signal and similar platforms that do not use typical identifiers, the government's overly inclusive filter approach included asking for any additional attorney identifiers that are not readily accessible through public sources like a court docket or attorney's website. This is *not* a request for investigative leads. Under the filter protocol, any identified usernames would be *removed* without filter team's review. And the investigative team would not have access to the filtered content.

***Testimonial.*** A communication is "testimonial" if it "explicitly or implicitly, relate[s] a factual assertion or disclose information." *Doe v. United States*, 487 U.S. 201, 210 (1988). Yet the Supreme Court has explained that a "neutral act," like providing your "name and address" is not "testimonial in the Fifth Amendment sense." *California v. Byers*, 402 U.S. 424, 431–32 (1971) (plurality op.). And "whether a compelled

communication is testimonial for purposes of applying the Fifth Amendment often depends on the facts and circumstances of the particular case." *Doe*, 487 U.S. at 214–15. Here, the information sought—attorneys' names and usernames—is "neutral." *Byers*, 402 U.S. at 431. And the "circumstances" are purely administrative, they do not "provide information that will assist the prosecution in uncovering evidence." *Doe*, 487 U.S. at 215. The Court should reject the defendants' "extravagant extension" of the Fifth Amendment privilege. *Byers*, 402 U.S. at 431.

***Incriminating.*** The Court need not decide whether lawyers' names are testimonial, though, because the defendants also fail on the incriminating prong. A statement counts as "incriminating" if it would either directly "support a conviction under a federal criminal statute" or "furnish a link in the chain of evidence needed to prosecute the claimant for a federal crime." *Hoffman v. United States*, 341 U.S. 479, 486 (1951). The defendants rely on the link-in-the-chain theory, arguing that attorneys' "social media accounts or 'screen names'" could "be utilized for . . . investigatory leads." (ECF No. 178, PageID.1018–19). But that vague hypothetical is not the kind of "real and appreciable fear" of

incrimination that permits a defendant to invoke the Fifth Amendment. *Hiibel*, 542 U.S. at 190.

Further, the defendants do "not explain how the disclosure of" their lawyers' names could be "used against [them] in a criminal case." *Id.* And an unrelated border search of a different lawyer does not give the defendants "reasonable cause to apprehend danger from a direct answer" about their lawyers' identities. *Hoffman*, 341 U.S. at 486. If the government tried to question the defendants' civil lawyers (which it has no plans to do), those lawyers would inevitably invoke attorney-client privilege on the defendants' behalf. And the defendants would be no more "incriminated" than they are now. To the extent that the defendants argue that providing their lawyers names might incriminate *other* people, they cannot assert the privilege "to protect others from possible criminal prosecution." *United States v. Mandujano*, 425 U.S. 564, 572 (1976) (plurality op.).

Perhaps recognizing that they cannot keep their attorney's identities completely secret, the defendants argue that they could reveal the names to a special master, who could conduct the privilege screening. (*See* ECF No. 178, PageID.1019–20). But the two cases that cite support

their claim are inapposite. One case—*In re Search Warrant Issued June 13, 2019*, 942 F.3d 159 (4th Cir. 2019)—does not even mention the Fifth Amendment. And the Ninth Circuit's *In re Grand Jury Subpoena*, 127 F.4th 139 (9th Cir. 2025), does not stand for the broad proposition that "the Fifth Amendment bar[s] a district court from compelling a target's law firm to produce a privilege log." (*See* ECF No. 178, PageID.1019). In that case, a grand jury sought *documents* from a target, who refused to produce them on Fifth Amendment grounds. *See* 127 F.4th at 142. The grand jury then subpoenaed the documents from the target's law firm and asked for a privilege log for any documents protected by the Fifth Amendment. *Id.* The Ninth Circuit held that the firm did not have to produce the log because doing so would trigger the "foregone-conclusion exception" to the Fifth Amendment. *Id.* at 143. If the firm produced a privilege log, "and then subpoena[ed] Client for the documents described in that privilege log, the documents would be subject to the foregone-conclusion exception, and Client would no longer be able to assert the act-of-production privilege." *Id.* at 144. Since the government is not asking for any documents, that foregone-conclusion concern does not apply here.

Finally, Defendants vaguely argue that "[c]ompelling the identities of consulting counsel raises a separate Sixth Amendment concern" because it could "reveal defense preparation and strategy." (*See* ECF No. 178, PageID.1020). But this two-sentence argument is insufficient to raise that issue. *See United States v. Hendrickson*, 822 F.3d 812, 829 n.10 (6th Cir. 2016) ("A party may not raise an issue on appeal by mentioning it in the most skeletal way, leaving the court to put flesh on its bones." (citation modified)). And in any event, the argument fails on the merits. Simply revealing an attorney's identity does not "reveal defense preparation and strategy." (*See* ECF No. 178, PageID.1020). That is why "the fact of legal consultation or employment, clients' identities, attorney's fees, and the scope and nature of employment are not deemed privileged." *Humphreys*, 755 F.2d at 1219.

The single case the defendants cite on this point, *Weatherford v. Bursey*, 429 U.S. 545, 554 (1977), undermines their argument. There, the Court found no Sixth Amendment violation after an undercover agent (charged as a co-defendant to maintain his cover) *attended meetings between the defendant and his lawyer where they discussed trial strategy*. *Id.* at 548, 554–55. That was because the agent "communicated nothing

at all to his superiors or to the prosecution about [the defendant's] trial plans or about the upcoming trial." *Id.* at 556. If there is no Sixth Amendment violation when an undercover agent attends an otherwise confidential meeting, then disclosing an attorney's name is not even close.

## Conclusion

This Court should deny the defendants' motion.

Respectfully submitted,

JERROME F. GORGON JR.,
United States Attorney

*s/ Dominic X. Barceleau*
Margaret M. Smith
Robert M. Kuhn
Dominic X. Barceleau
Assistant U.S. Attorneys
211 West Fort Street, Suite 2001
Detroit, Michigan 48226
(313) 224-9186
dominic.barceleau@usdoj.gov

Dated: October 19, 2026

## Certificate of Service

I certify that on October 19, 2026, I electronically filed this Response and Brief in Support with the Clerk of the Court using the ECF system which will send notification of such filing to the following:

Attorneys of record

s/*Dominic X. Barceleau*
Dominic X. Barceleau
Assistant U.S. Attorney
United States Attorney's Office